Docket Nos. 82231, 82249 cons.–Agenda 20–September 1997.

THE CITY OF BELVIDERE, Appellee, v. THE ILLINOIS STATE LABOR RELATIONS BOARD 
et al
., Appellants.

Opinion filed February 20, 1998.

JUSTICE BILANDIC delivered the opinion of the court:

This appeal arises out of a decision and order of the Illinois State Labor Relations Board (Board), finding that the City of Belvidere (City) had committed an unfair labor practice under section 10(a)(4) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(4) (West 1994)). The Board determined that the City had committed an unfair labor practice because it refused to bargain with the Belvidere Professional Firefighters Association (union) over its decision to contract out paramedic services to a private ambulance company. The Board found that the City's unilateral decision to contract with a private company to provide paramedic services to City residents involved a mandatory subject of collective bargaining. The Board therefore ordered the City to rescind the contract with the private ambulance company and engage in collective bargaining with the union.

The City sought review of the Board's decision and order in the appellate court. The appellate court reversed, holding that the City's decision to contract with a private company to provide paramedic services was not a mandatory subject of collective bargaining. 283 Ill. App. 3d 663. As such, the City's refusal to bargain did not amount to an unfair labor practice.

The Board and the union filed petitions for leave to appeal with this court. We allowed the petitions and consolidated the appeals. 166 Ill. 2d R. 315. We also permitted the Associated Firefighters of Illinois to file an 
amicus curiae
 brief in support of the Board's decision.

For the reasons that follow, we affirm the decision of the appellate court, which reversed the Board's decision and order.

BACKGROUND

In 1974, the City purchased its first ambulance and began providing its residents with emergency medical services (EMS) through its fire department. The Emergency Medical Services (EMS) Systems Act (EMS Act) (210 ILCS 50/1 
et seq
. (West 1994)) governs the provision and regulation of EMS in Illinois. The EMS Act established three levels of EMS: basic life support (BLS), intermediate life support (ILS), and advanced life support (ALS). 210 ILCS 50/4.06, 4.19, 4.01 (West 1994). The EMS Act also sets forth three corresponding levels of technicians, who are licensed by the Illinois Department of Public Health (Department) (210 ILCS 50/10 (West 1994)) to perform EMS (210 ILCS 50/11 (West 1994)).

The lowest level of licensed technician is an Emergency Medical Technician–Ambulance (EMT–A). 210 ILCS 50/4.12 (West 1994).
(footnote: 1) An EMT–A renders BLS services, which includes airway management, cardiopulmonary resuscitation, control of shock and bleeding and splinting of fractures. 210 ILCS 50/4.06 (West 1994). The findings of the City's ad hoc committee show that the training requirements for an EMT–A are 140 hours of classroom training and 10 hours of clinical training.

The next level of licensed technician is an Emergency Medical Technician–Intermediate (EMT–I). 210 ILCS 50/4.15 (West 1994). An EMT–I is authorized to provide BLS services and certain advanced life support services. 210 ILCS 50/4.15, 4.19 (West 1994). A licensed EMT–I has completed an additional 80 hours of classroom training and 30 hours of clinical training.

The third and highest level of licensed technician is an Emergency Medical Technician–Paramedic (EMT–P). 210 ILCS 50/4.13 (West 1994). An EMT–P performs ALS services which include all BLS services and cardiac monitoring, cardiac defibrillation, electrocardiography, administration of antiarrhythmic agents, intravenous therapy, administration of medication, drugs and solutions, use of adjunctive medical devices, trauma care, and other authorized techniques and procedures. 210 ILCS 50/4.13, 4.01 (West 1994). This level of technician requires an additional 360 hours of classroom training and 140 hours of clinical training.

In addition to regulating EMS rendered by technicians, the EMS Act also authorizes the Department to license and set standards for the operation of ambulances. 210 ILCS 50/9 (West 1994). The Department licenses ambulances to provide a specific level of service: either BLS, ILS, or ALS. 77 Ill. Adm. Code §535.100(g) (1994). Every ambulance, regardless of service level, must be staffed with at least two EMTs. 77 Ill. Adm. Code §535.150(f)(1) (1994). An ILS ambulance must be staffed with at least one EMT–I and an ALS ambulance must be staffed with at least one EMT–P. 77 Ill. Adm. Code §535.150(f)(3) (1994).

As stated above, the City's fire department began providing EMS to Belvidere residents in 1974. The level of service was less than BLS; however, one or two firefighters began training as EMTs. By 1976, the City required its firefighters, as a condition of employment, to become licensed EMT–As. In 1980, the City purchased and began operating a second ambulance. In the late 1980s, several of the City's firefighters began training as EMT–Is. By 1990, six firefighters had received EMT–I certification, and the City began operating one of its ambulances at the ILS level.

Throughout this time period, when the City received a “911” call, the fire department ambulance had dispatch priority. That is, in response to a “911” call, the fire department dispatcher would send a fire department ambulance staffed with two firefighter EMTs to the scene unless the caller specifically requested a private ambulance. On other occasions, the dispatcher sometimes requested backup assistance from private ambulance companies, which operated ambulances staffed with EMT–Ps. Such assistance was requested when “911” calls came in while the fire department's ambulances were already in service, or when additional emergency medical personnel were needed. At such time, the City's firefighter/EMTs worked alongside the paramedics from the private ambulance companies to provide EMS. Among the private ambulance companies operating within Belvidere at that time was Lifeline Ambulance Service, Inc. (Lifeline).

In late 1989 or early 1990, the City required three probationary firefighters to sign individual agreements to become licensed and certified EMT–Is or EMT–Ps as a condition of employment. The current union's predecessor subsequently filed a grievance complaining that the City contracted separately with individual bargaining-unit members in violation of the collective-bargaining agreement. An unfair labor practice charge was later filed with the Board. The matter was resolved when the City agreed to remove the individual agreements from the firefighters' personnel files. The unfair labor practice charge was ultimately withdrawn because the City agreed to put the paramedic issue on the “back burner” and to notify the union before considering the paramedic issue in the future.

In 1990, during negotiations for a new collective-bargaining agreement, the City and the current union's predecessor discussed proposals for a paramedic program within the fire department. The parties were unable to reach an agreement on such a program, which was therefore not implemented.

Sometime in 1991, two EMT–I firefighters voluntarily downgraded their certification to EMT–A for apparently personal reasons. This action caused the City to be unable to run a properly staffed ILS ambulance. Accordingly, the ILS ambulance was downgraded to a BLS ambulance.

On May 13, 1991, the City's public safety committee created an ad hoc committee to discuss the feasibility of upgrading the City's EMS program by turning over the City's ambulance service to an outside party or providing advanced service within the fire department. The ad hoc committee conducted a survey of the fire department's EMS program of comparable municipalities within geographic proximity to Belvidere. The ad hoc committee also sent a questionnaire to a number of private ambulance companies inquiring as to the level and scope of services that the companies offered and background information. Lifeline was one of the private companies that responded. The ad hoc committee also received a proposal from the fire department, which recommended that the City provide paramedic services through the fire department.

On October 9, 1991, the ad hoc committee submitted its findings and recommendations to the City's public safety committee. The ad hoc committee recommended that the City's level of EMS be upgraded to the paramedic level. The committee noted that a proposal had been received from the City's firefighters to offer this service. “The terms, conditions, and costs,” the committee found, “will need to be set out in a future contract and should be recommended to negotiators.” The committee recommended that “should the City institute the program,” any firefighters hired after August 1989 be required to obtain paramedic certification. The committee further noted that another option would be privatization of EMS and that four private ambulance companies had expressed an interest in performing the service. However, cost data for such an option could only be supplied if the City assembled bid specifications for the service. Accordingly, the committee suggested that bid specifications be prepared and submitted to the four private companies as a means to compare private paramedic service with paramedic service through the fire department.

On October 14, 1991, the City's public safety committee considered the ad hoc committee's recommendations and established a special committee to prepare bid specifications for private ambulance service with paramedics.

In January of 1992, the City prepared and sent its bid specifications to four private ambulance companies. All four ambulance companies responded; however, three of the companies declined to submit proposals. Only Lifeline indicated that the City's specifications were generally acceptable. The union also submitted a response to the bid specification, which included a list of the advantages of using firefighters as paramedics.

During the negotiation of a new collective-bargaining agreement in 1992, the City and the union discussed proposals for a paramedic program within the fire department. The parties were unable to reach an agreement.

On January 14, 1993, the fire chief sent a letter to the City's finance and personnel committee stating that the union had decided to begin paramedic training. In the letter, the fire chief suggested to the City that it would be preferable if the City and the firefighters were in agreement on such training. He further advised the committee to reopen the firefighters' collective-bargaining agreement to discuss the issue of paramedic training. The fire chief subsequently prepared a report analyzing the cost of instituting a paramedic level EMS program in the fire department using firefighters.

Shortly after the fire chief submitted his report, the City resolicited bids for paramedic ambulance service from private ambulance companies. The City, by letter, advised the union of its resolicitation of bids from private companies and sent the union a copy of the bid solicitation. A series of letters between the union and the City followed. The union took the position that the City's letter was a proposal to modify the collective-bargaining agreement between the union and the City. The city attorney informed the union that the City did not intend to reopen the labor agreement. The union responded by formally requesting to bargain over the decision to contract out paramedic services. The City declined the request to bargain because it claimed to have no duty to bargain over the issue.

On September 7, 1993, the City decided to enter into a contract with Lifeline to provide paramedic ambulance service. Under the City's agreement with Lifeline, Lifeline was granted dispatch priority for EMS calls in exchange for its agreement to provide paramedic level EMS. The City's firefighter/EMTs would continue responding to EMS calls on a backup, or assistance, basis to Lifeline's paramedics. However, they would automatically be dispatched to assist Lifeline paramedics on certain emergency calls, including those involving cardiac or respiratory emergencies, trauma and motor vehicle accidents.

In a letter dated September 8, 1993, the union demanded collective bargaining over the effects of the City's decision to enter into the Lifeline contract. The City agreed to enter into bargaining over the “effects” of the City's decision; however, the City refused to bargain over its decision to contract with Lifeline.

On September 13, 1993, the union filed an unfair labor practice charge with the Board. The basis of the charge was the City's refusal to bargain over its decision to contract out paramedic services, which, according to the Union, was a mandatory subject of collective bargaining.

After a hearing on the union's charge, an administrative law judge (ALJ) issued a recommended decision and order. The ALJ ruled that the City had not committed an unfair labor practice because the City's decision to contract out paramedic services with a private company was not a mandatory subject of collective bargaining. The ALJ reasoned that the City's decision did not affect wages, hours, or terms and conditions of employment. The ALJ noted that the contract for paramedic services did not result in the elimination of firefighter positions or change the wages, hours or other conditions of the firefighters' employment. Moreover, the firefighters were not deprived of a reasonably anticipated work opportunity because paramedic duties had never been performed by firefighters. Instead, the ALJ found that the City's decision was merely a matter of inherent managerial authority. It was the opinion of the ALJ that the City's decision was inherently a public policy decision about the functions and level of emergency medical services the City's fire department would provide to the citizens of Belvidere. Therefore, the ALJ concluded, the City's refusal to bargain with the union prior to implementing the decision to contract with a private company for paramedic services did not constitute a breach of its duty to bargain in good faith. The ALJ thus dismissed the union's complaint. The union filed exceptions to the ALJ's decision and order with the Board.

Following oral arguments, the Board issued its decision and order finding that the City's refusal to negotiate with the union amounted to an unfair labor practice because the City's decision to contract out paramedic services was a mandatory subject of bargaining. In rendering its decision, the Board first determined that the City's decision affected wages, hours and other conditions of the firefighters' employment. The Board found that the City's action involved a departure from its previously established operating practices because, by removing the firefighter/EMTs' dispatch priority, there had been a change in the “quality and kind” of the City's prior subcontracting of EMS. The Board also found that the City's action had an adverse impact on the firefighters' conditions of employment because the firefighters responded to fewer EMS calls. In addition, the City's decision foreclosed any opportunities the firefighters had for promotion to a higher EMT level, namely paramedic. The Board further found that the City's decision resulted in a significant impairment of reasonably anticipated, fairly claimable work opportunities for the firefighters because paramedic services are merely an upgrade of the services already being performed by the firefighter/EMTs. Based on these findings, the Board determined that the City's decision affected wages, hours and terms and conditions of employment. The Board then balanced the benefits that bargaining would have on the decisionmaking process with the burdens that bargaining would impose on the City's authority. The Board concluded that the City did not demonstrate that requiring it to bargain over who will perform paramedic services for its citizens will significantly impair its ability to perform its governmental functions. Moreover, the benefit to the firefighters and to the collective-bargaining process is clear and compelling. Consequently, the benefits of bargaining outweighed any burden on the City's authority.

The Board therefore concluded that the City's decision concerned a mandatory subject of bargaining. Accordingly, the City committed an unfair labor practice because it made a unilateral change in a mandatory bargaining subject without granting prior notice and an opportunity to bargain with the bargaining representative of the firefighters, the union. The Board therefore ordered the City to cease from refusing to bargain collectively with the union, rescind the contract with Lifeline, and bargain with the union over paramedic services.

The City filed a petition for review of the Board's decision and order in the appellate court. The appellate court, in reversing, reasoned that the City's decision to contract with a private company to provide paramedic services did not affect wages, hours or other conditions of the firefighters' employment. As such, the appellate court found that the City's decision was not a mandatory subject of collective bargaining. The appellate court concluded that the Board's determination to the contrary was clearly wrong and that the City had no duty to bargain.

ANALYSIS

The issue in this appeal is whether the City's refusal to engage in collective bargaining with the union over the City's decision to contract out paramedic services to a private ambulance company amounted to an unfair labor practice in violation of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 
et seq
. (West 1994)). Section 10(a)(4) of the Act provides:

“(a) It shall be an unfair labor practice for an employer or its agents:

* * *

(4) to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit ***.” 5 ILCS 315/10(a)(4) (West 1994).

In resolving whether the City committed an unfair labor practice in violation of section 10(a)(4), we must determine whether the City had a mandatory duty to bargain collectively with the union before contracting with a private company to provide paramedic services. Therefore, the key determination in this appeal is whether the City's decision to contract out paramedic services to a private company constitutes a mandatory subject of collective bargaining.

The Act imposes a duty on a public employer, such as the City, to engage in good-faith collective bargaining with its employees' representative under certain circumstances. Section 7 of the Act addresses a public employer's duty to bargain over mandatory subjects of collective bargaining. Section 7 of the Act specifically provides in part:

“A public employer and the exclusive representative have the authority and the duty to bargain collectively [as] set forth in this Section.

For the purposes of this Act, `to bargain collectively' means *** to negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by Section 4 of this Act ***.” 5 ILCS 315/7 (West 1994).

Thus, pursuant to this section of the Act, an employer has a duty to bargain over issues which affect “wages, hours, and other conditions of employment.”

Section 4 of the Act further clarifies the employer's duty to bargain. Section 4 provides in relevant part:

“Employers shall not be required to bargain over matters of inherent managerial policy ***. Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours and terms and conditions of employment ***.” 5 ILCS 315/4 (West 1994).

Accordingly, we must determine whether the City's decision to contract out for paramedic services affects wages, hours and other conditions of the firefighters' employment so as to constitute a mandatory subject of collective bargaining.

Before addressing the merits of this issue, we must first determine the applicable standard of review. The parties dispute what standard of review is applicable in this appeal. The Board argues that this case involves a question of fact. The City and the union argue that this case involves a mixed question of law and fact. This appeal comes to us on review of an order of an administrative agency, the Illinois State Labor Relations Board (Board), which is responsible for administering and enforcing the Illinois Public Labor Relations Act. 5 ILCS 315/5 (West 1994). Pursuant to the Act, judicial review of the Board's decision is limited and governed by the Administrative Review Law (735 ILCS 5/3–110; 5 ILCS 315/11(e) (West 1994)). Section 3–110 of the Administrative Review Law provides that judicial review of an administrative agency's decision extends to all questions of law and fact presented in the record. 735 ILCS 5/3–110 (West 1994). The standard of review applicable to the agency's decision depends upon whether the question presented is one of fact or law.

An administrative agency's findings and conclusions on questions of fact are deemed to be 
prima facie
 true and correct. 735 ILCS 5/3–110 (West 1994). In examining an administrative agency's factual findings, a reviewing court does not weigh the evidence or substitute its judgment for that of an administrative agency. See 
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 88 (1992); 
Launius v. Board of Fire & Police Commissioners
, 151 Ill. 2d 419, 427-28 (1992). Instead, a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence. See 
Abrahamson
, 153 Ill. 2d at 88; 
Launius
, 151 Ill. 2d at 427; 
City of Freeport v. Illinois State Labor Relations Board
, 135 Ill. 2d 499, 507 (1990). An administrative agency's factual determinations are contrary to the manifest weight of evidence where the opposite conclusion is clearly evident. See 
Abrahamson
, 153 Ill. 2d at 88; 
City of Freeport
, 135 Ill. 2d at 507.

An administrative agency's findings on a question of law, on the other hand, are reviewed with less deference. A court reviews such determinations on a 
de novo
 basis. See 
Branson v. Department of Revenue
, 168 Ill. 2d 247, 254 (1995). As such, an agency's decision on a question of law is not binding on a reviewing court. See 
Envirite Corp. v. Illinois Environmental Protection Agency
, 158 Ill. 2d 210, 214 (1994); 
City of Freeport
, 135 Ill. 2d at 507.

We agree with the City that the issue presented in this case cannot be accurately characterized as involving solely a question of fact or a question of law. Instead, the Board's determination is best considered a mixed question of fact and law. See 
Branson
, 168 Ill. 2d at 265. The Board's finding is, in part, factual because it involves considering whether the facts in this case support a finding that the City's decision affected wages, hours and other conditions of employment. Nevertheless, the Board's finding also concerns a question of law because the phrase “wages, hours and other conditions of employment” is a legal term that requires interpretation. Consequently, because this case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law. Given the mixed nature of the Board's decision, we find that the applicable standard of review should be between a manifest weight of the evidence standard and a 
de novo
 standard so as to provide some deference to the Board's experience and expertise. We therefore hold that a clearly erroneous standard of review is appropriate to examine the Board's decision. See generally T. O'Neill & S. Brody, 
Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341
, 83 Ill. B.J. 512 (1995). We now turn to the merits of this appeal.

This court has previously considered the scope of an employer's duty to bargain. This court set forth a three-pronged test for determining whether an issue is a mandatory subject of collective bargaining in 
Central City Education Ass'n v. Illinois Educational Labor Relations Board
, 149 Ill. 2d 496 (1992). The first prong of the test involves a determination of whether the matter is one of wages, hours and terms and conditions of employment. 
Central City
, 149 Ill. 2d at 523. If the answer to this question is no, then the inquiry ends and the employer is under no duty to bargain. 
Central City
, 149 Ill. 2d at 523. However, if the answer is yes, then the second prong of the test must be reached. The second prong considers whether the matter, in addition to affecting wages, hours and terms and conditions of employment, is also one of inherent managerial authority. 
Central City
, 149 Ill. 2d at 523. If the answer to this question is no, the analysis ends and the matter is considered a mandatory subject of collective bargaining. 
Central
 
City
, 149 Ill. 2d at 523. If, however, the answer to the second inquiry is yes, then the reviewing court proceeds to the third and final prong of the test. The third prong weighs the benefits that bargaining will have on the decision-making process against the burdens that bargaining imposes on the employer's authority. 
Central City
, 149 Ill. 2d at 523.

Although the three-pronged test set forth in 
Central City
 arose in the context of the Illinois Educational Labor Relations Act (115 ILCS 5/1 
et seq
. (West 1994)), we find that this test applies in cases, such as this, arising under the Illinois Public Labor Relations Act. The Board and our appellate court have repeatedly applied this test in the public labor relations setting. See 
Village of Franklin Park v. Illinois State Labor Relations Board
, 265 Ill. App. 3d 997 (1994); 
County of Cook (Cermak Health Services)
, 10 Pub. Employee Rep. (Ill.) par. 3009, No. L–CA–92–116 (ILLRB January 19, 1994). Given the substantial similarity in the management rights and the employer rights section in both Acts, we are persuaded that the application of the 
Central City
 test in this matter is correct. Compare 115 ILCS 5/4 (West 1994) with 5 ILCS 315/4 (West 1994). We, therefore, apply the 
Central City
 test to determine whether the City had a duty to bargain with the union over its decision to contract out paramedic services.

The first prong of the 
Central City
 test requires us to determine whether the City's decision to contract out paramedic services to an outside party was one of wages, hours and terms and conditions of the firefighters' employment. The National Labor Relations Board, in 
Westinghouse Electric Corp.
, 150 N.L.R.B. 1574 (1965), set forth a number of factors to be considered in determining whether an employer's unilateral subcontracting decision is a mandatory subject of bargaining. Although the National Labor Relations Board in 
Westinghouse
 addressed a private employer's duty to bargain under the National Labor Relations Act (29 U.S.C. §151 
et seq
. (1994)), the parties agree that the 
Westinghouse
 factors are applicable to this case. These factors have previously been applied by the Illinois courts and the Illinois Educational Labor Relations Board in considering the first prong of the 
Central City
 test. See 
Board of Education of Sesser-Valier Community Unit School district v. Illinois Educational Labor Relations Board
, 250 Ill. App. 3d 878, 885 (1993); 
University of Illinois at Chicago (Board of Trustees)
, 12 Pub. Employee Rep. (Ill.) par. 1087, No. 93–CA–0039–C (IELRB September 24, 1996). Moreover, the unfair labor practice provisions of the two acts are similar. Compare 29 U.S.C. §§158(a)(5), (d) (1994) with 5 ILCS 315/10(a)(4), (a)(7) (West 1994). We therefore will consider the 
Westinghouse
 factors to determine whether the City's decision in this case is one of wages, hours, and terms and conditions of the firefighters' employment.

In 
Westinghouse
, the National Labor Relations Board determined that an employer's unilateral subcontracting decision is a mandatory subject of bargaining when the subcontracting (1) involved a departure from previously established operating practices, (2) effected a change in the conditions of employment, or (3) resulted in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities for those in the bargaining unit. 
Westinghouse
, 150 N.L.R.B. at 1576. First, we consider whether the City's decision to contract out paramedic services constitutes a departure from previously established operating practices. The record shows that, even prior to its contracting with Lifeline, the City did not provide EMS to its residents exclusively through its fire department employees. The record does not indicate if there was ever a formal contractual relationship between the City and private ambulance companies prior to the contract with Lifeline. Moreover, it is not disputed that prior to the City's contract with Lifeline, private ambulance companies had historically provided EMS in cooperation with the firefighters. While the firefighters provided basic life support (BLS) services and at times intermediate life support (ILS) services, they never provided advanced life support (ALS) services at the paramedic level. In fact, the private ambulance companies were the only providers of paramedic services within Belvidere. Consequently, the City had an established operating practice of permitting the firefighters and the private ambulance companies to share in the provision of EMS and, further, of providing paramedic services through private companies.

The City did not depart from this practice in “quantity and kind,” as advocated by the Board, when the City formally contracted with Lifeline. The City's contract with Lifeline does not change the quantity or kind of work performed by its firefighters, who would continue to provide EMS. Although the firefighters have lost their dispatch priority on EMS calls to Lifeline, they continue to be dispatched automatically on some emergency calls, including those involving cardiac or respiratory emergencies, trauma and motor vehicle accidents. As such, the firefighters continue to respond to emergency calls and provide EMS. The firefighters had never performed paramedic services prior to the Lifeline contract. Thus, the performance of those services by Lifeline does not constitute a change in practice. In sum, both before and after the Lifeline contract, the fire department and private ambulance companies share in the provision of EMS. We conclude that the record shows that the City's contracting out of paramedic services did not depart from the City's prior practice with regard to the provision of EMS.

The next 
Westinghouse
 factor we examine is whether the City's decision effects a change in the firefighters' conditions of employment. As noted, the firefighters continue to provide EMS and respond to emergency calls. The fact that the firefighters lost their dispatch priority on “911” calls and function as a backup to Lifeline does not change their conditions of employment, which is to perform EMS. There is no indication that the contract with Lifeline resulted in the elimination of firefighter positions or in a reduction in the firefighters' hours or wages. We acknowledge that a change in the condition of employment is not limited to an elimination of positions or alteration of wages or hours, but may also encompass the loss of potential work or promotional opportunities. See 
Village of Franklin Park v. Illinois State Labor Relations Board
, 265 Ill. App. 3d 997 (1994). Nevertheless, the record in this case establishes that the contracting out of paramedic services did not deprive the firefighters of potential work or promotional opportunities. The firefighters never performed paramedic services and were neither legally capable nor qualified to provide such services. The firefighters were licensed as EMT–As and at times EMT–Is. As set forth in the facts, there are significant qualitative differences in the types of emergency services provided by licensed EMT–As and EMT–Is in comparison to EMT–Ps, who perform all advanced life support services. The facts also reveal the qualitative differences in the level of training that individuals undergo to attain being licensed as an EMT–A, EMT–I, or EMT–P. It is evident from these significant differences in service and training that providing paramedic services is not merely an extension or upgrade of EMS provided at the level of EMT–A or EMT–I. Therefore, performing paramedic services was neither potential work nor a promotional opportunity for the firefighters. Consequently, the City's contracting out of paramedic services did not change the firefighters' conditions of employment, which consisted of providing EMS.

The final 
Westinghouse
 factor is whether the City's decision results in a significant impairment of job tenure, employment security or reasonably anticipated work opportunities for the firefighters. The Board and the union contend that the City's decision results in a significant impairment of the firefighters' reasonably anticipated work opportunities. In light of the previously discussed qualitative differences in the nature of paramedic services as compared to the level of EMS provided by the fire department, the firefighters did not have a reasonable expectation of performing paramedic services. Paramedic services were not fairly claimable as a work opportunity by the firefighters because they did not possess the necessary qualifications or licensing to perform such services. Moreover, the fact that the City had on prior occasions discussed with the firefighters the possibility of training them to become paramedics does not result in a reasonable expectation of performing paramedic work. Those discussions never resulted in an agreement on paramedic training. In addition, the City informed the firefighters that it also was considering private companies to provide such services. We find that the record shows that providing paramedic services did not represent a reasonably anticipated work opportunity fairly claimable by the firefighters.

In sum, we determine that the City's decision to contract out paramedic services to a private ambulance company is not one of wages, hours and terms and conditions of the firefighters' employment. The first prong of the 
Central City
 test has therefore not been met. Accordingly, the City's decision did not involve a mandatory subject of bargaining pursuant to section 7 of the Act. The Board's determination to the contrary is clearly erroneous. The City therefore did not commit an unfair labor practice in violation of section 10(a)(4) of the Act.

CONCLUSION

For the foregoing reasons, we affirm the decision of the appellate court, which set aside the decision and order of the Board.

Appellate court judgment affirmed.

JUSTICE HARRISON, dissenting:

The majority's decision was completely predictable. Over the past several years, this court has become an inhospitable place for organized labor and the Illinois Public Labor Relations Act (5 ILCS 315/1 
et seq
. (West 1994)). See,
 e.g.
, 
Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board
, 178 Ill. 2d 333 (1997); 
American Federation of State, County & Municipal Employees v. Department of Central Management Services
, 173 Ill. 2d 299 (1996); 
Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board
, 166 Ill. 2d 296 (1995). The government wins, the unions lose, and that is that. There was no reason to think this case would be treated differently.

If the matter were decided on the merits, as it should be, one would have to conclude that the Illinois State Labor Relations Board (the Board) was entirely correct in holding that the City of Belvidere committed an unfair labor practice when it refused to bargain with the union collectively in good faith regarding its decision to contract out paramedic services. The issue was a mandatory subject of collective bargaining under the standards set forth in 
Central City Education Ass'n v. Illinois Educational Labor Relations Board
, 149 Ill. 2d 496 (1992), as the Board properly held.

In rejecting the Board's decision, my colleagues rely on the first prong of the 
Central City
 test, which asks whether the employer's actions involve wages, hours, and terms and conditions of employment. 
Central City
, 149 Ill. 2d at 523. 
Central City
 makes clear that this question is one that the administrative agency “is uniquely qualified to answer.” 
Central City
, 149 Ill. 2d at 523. Contrary to 
Central City
, however, the majority shows no deference whatever to the Board's experience and understanding of bargaining. Purporting to employ a “clearly erroneous” standard, what the majority does instead is simply substitute its own judgment for that of the Board.

Rejecting the Board's factual determinations, my colleagues depict the City's decision as inconsequential. Although it is true that there has been no reduction in work force or pay, at least so far, those factors are not dispositive. Under 
Westinghouse Electric Corp.
, 150 N.L.R.B. 1574 (1965), which this court has adopted, the issue is whether the employer's decision involves a departure from previously established operating practices, effects a change in the conditions of employment, or results in a significant impairment of job tenure, employment security, or reasonably anticipated work opportunities. 

In the matter before us, the City entered into a private contract for EMS services where there had been no such contracts before, it took primary responsibility for EMS work away from its firefighters and bestowed it on a private contractor, and it eliminated the opportunity its firefighters previously had to advance by upgrading their levels of EMS certification. In light of these facts, I fail to see how one can seriously deny that the City departed from previously established operating practices, changed the conditions of the firefighters' employment, and significantly impaired the firefighters' work opportunities. The City's decision therefore qualifies as a matter “of wages, hours and terms and conditions of employment” under the first part of the 
Central City
 test.

The result reached by the majority reflects a narrow view of the Illinois Public Labor Relations Act in which the duty to bargain collectively is seen as the exception rather than the rule. That view is directly contrary to the law. Under the Act, the duty to bargain collectively is broad, and any exceptions should be construed narrowly. See, 
e.g
., 
City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268
, 122 Ill. 2d 353, 364-66 (1988).

I do not understand my colleagues' reluctance to give the policies and provisions of the Act effect. To say that the City has the duty to bargain collectively here does not mean that the City cannot ultimately subcontract EMS services to private companies or alter the EMS responsibilities presently held by its firefighters. As Justice Miller correctly noted in 
City of Decatur
, 122 Ill. 2d at 367, and as section 7 of the Act (5 ILCS 315/7 (West 1994)) provides, the duty to bargain collectively does not require a party to reach a particular agreement or make a particular concession. For the purposes of the dispute before us today, it means simply that the parties must meet and talk in good faith before final action is taken. There is no possible harm in that. And it is the law. I therefore dissent.

FOOTNOTES
1:
Effective July 19, 1995, the EMT–A designation was changed to EMT–B (Basic). 210 ILCS 50/3.50 (West 1996). We continue to use EMT–A because that designation was in effect during the period relevant to this appeal.