NO. 4-04-0484

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, 

    Petitioner-Appellant,

    v.

THE ILLINOIS LABOR RELATIONS BOARD, STATE PANEL, and THE FRATERNAL ORDER OF POLICE LABOR COUNCIL, 

        Respondents-Appellees. 

)

)))))

)

)

On Direct Appeal from

Illinois Labor Relations Board, 

State Panel,

Nos. SCA02038,

     SCA02048

_________________________________________________________________

JUSTICE KNECHT delivered the opinion of the court:

The Board of Trustees of the University of Illinois, Urbana-Champaign campus (University) appeals the order of the Illinois Labor Relations Board that found the University's refusal to bargain over providing parking or reimbursing parking expenses for members of the Fraternal Order of Police Labor Council (FOP) was an unfair labor practice within the meaning of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/1 through 27 (West 2000)).  

In October 2002, after a hearing, an administrative law judge (ALJ) found in favor of the FOP on two unfair labor practice charges.  The University filed exceptions to the ALJ’s finding, and in January 2004, the Labor Relations Board State Panel (State Panel) affirmed the ALJ’s finding.  The University appealed directly to this court, arguing (1) the ALJ and the State Panel erred in finding that parking and parking fees are terms or conditions of employment; (2) the ALJ and the State Panel erred in finding that parking and parking fees were not matters of the University’s inherent managerial authority; and (3) if parking or parking fees are matters of inherent managerial authority, the University need not bargain with the FOP because the burden upon the University outweighs the benefits of bargaining.  We agree as to issues 2 and 3 and reverse.

I. BACKGROUND

The FOP is the certified bargaining agent for two University police department bargaining units, Police Officer I and Corporals and Sergeants.  In July 2001, during collective bargaining, the FOP submitted a proposal concerning parking for the member officers.  The proposal stated, in pertinent part, as follows:

"The [e]mployer shall provide bargain unit members with a parking space for their personal vehicles while on duty in a location reasonably close to their assignment of work, or alternatively, reimburse them for the cost of obtaining same."  

The University informed the FOP it did not believe parking was a mandatory subject of bargaining but would be willing to discuss the matter as a permissive bargaining subject.  In September and October 2001, the FOP filed two unfair-labor-practice charges against the University, alleging the University’s refusal was an unfair labor practice within the meaning of the Act.  In response to the allegation, the University filed an answer, claiming parking and reimbursement of parking expenses were not mandatory subjects of the bargaining under the Act. 

On October 30, 2002, the ALJ conducted a hearing at the offices of the Illinois Labor Relations Board.  The FOP called two police officers to testify.  Brian Tilson, a University police department patrol officer and the FOP president, testified first.  Tilson lives in Caltin, which is approximately 35 miles east of Urbana-Champaign, and he drives to work as no bus or train service is available from his home to the police headquarters.  Tilson worked in the police department for about 6 1/2 years, and he relied on public parking near his workplace during most of that time.  

A week before the hearing, Tilson bought an annual parking pass for the third shift for $75 so he could park in the campus parking lot next to police headquarters.  Parking passes can be purchased for parking lots and are lot-specific, and Officer Tilson’s pass was for lot B-18 near his station.  According to Tilson, lot B-18 was often full during the day, but parking was available at hourly meters on the street for a cost of $0.25 for 30 minutes.  Officer Tilson admitted he was not required to park in a university lot when he went to work and there was a city lot within walking distance, about four to five blocks from his station.  

Officer Tilson stated carpooling is not a feasible option for the officers since individual officers have different overtime details and other duties that would not allow the officers to leave at the same time.  All of the officers Officer Tilson knows drive to work.  Officer Tilson estimated if he could not park in the parking lot next to the police department, his travel time would increase by up to 30 minutes due to searching for a parking space.  Tilson further indicated parking was "a big concern for all" in Urbana-Champaign.

Vernon Frost, a University public safety officer, testified next.  Frost is a sergeant on the third shift who has worked on the campus for about 15 years.  Like Officer Tilson, Sergeant Frost also drives to work.  Sergeant Frost lives in Ogden, Illinois, which is about 15 miles east of Urbana-Champaign.  Sergeant Frost has a parking pass for the parking lot near the public safety building where he has been assigned since 1993.  Frost thinks the parking pass is a necessity because he has equipment such as his bulletproof vest, dry cleaning, and extra clothing he has to carry.  Sergeant Frost indicated on occasion, he has had to park on the street when his parking pass was expired.  Frost acknowledged he was usually able to find a parking spot on the street but stated he has been ticketed for expired parking meters. 

According to Sergeant Frost, all the police officers drive to work.  On cross-examination, Sergeant Frost admitted the officers who live in Urbana-Champaign­ could get to work without parking in a university lot.  Frost also stated he could live in Urbana-Champaign but his housing would be more expensive.  Frost further indicated police officers are permitted to park outside the station for a short period of time without getting a ticket.  The FOP rested after Sergeant Frost completed his testimony.

The University presented Margaret Rawles, an associate university counsel, as its first witness.  Rawles was the University’s chief spokesperson during the collective bargaining with the FOP.  Rawles testified that upon receiving the FOP’s parking proposal, the University responded that parking was not a mandatory subject of bargaining but it would be willing to discuss the issue on a permissive basis.

Rawles stated that in insisting parking was a permissive subject, the University was aware of the Illinois Education Labor Relations Board's (IELRB) decision in 
In re Southern Illinois University-Edwardsville Professional Staff Ass'n
, 15 Pub. Employee Rep. (Ill.) par. 1063, Nos. 97-CA-0016-S, 97-CA-0017-S (IELRB September 22, 1998), in which the IELRB found parking fees to be a mandatory bargaining subject.  Rawles, however, believed the factual basis for the decision by the IELRB in the 
Southern Illinois University-Edwardsville
 case was considerably different from the factual situation presented on the Urbana-Champaign campus.­  Specifically, Rawles pointed out the Southern Illinois University-Edwardsville (SIU-E) campus was isolated from the town and no alternative to university parking existed, while the University of Illinois, Urbana-Champaign (UIUC) campus was located in the midst of two cities and alternative city parking is available.  Rawles also believed transportation alternatives such as carpooling, buses, and shuttles are available to the police officers in Urbana-Champaign, and university employees may ride the Mass Transit District (MTD) buses for free.

Rawles believed bargaining the parking issue with the FOP would negatively impact the University; specifically, it would reduce the available parking to faculty, staff, students, and visitors.  Rawles explained the parking budget and parking locations are tied to the University’s building use and academic programming and providing free parking in specific locations could adversely impact the University’s academic programs.  

Rawles then stated requiring the University to bargain with one represented union group over parking would be detrimental to the inherent managerial authority of the University.  At the time of the hearing, the University had 16 other contracts with represented employee units and those contracts covered over 5,000 employees.  There were also numerous groups, including faculty members and students, that do not belong to a union.  Rawles testified it would be difficult for the University to set up a system whereby some employee groups have free campus parking and other groups do not.  Further, Rawles stated she had not identified any benefits to be derived from collective bargaining related to the parking issue.

On cross-examination, Rawles testified the University would be willing to engage in permissive negotiations over parking but all employees would have to be treated equally.  She admitted the chief of police, two captains, and the administrative assistant have university "take-home cars" and dedicated parking spots. 

The University next called Frederick Kallmayer.  Kallmayer is a captain of the University police department, and he has worked at the University for 22 years, 12 of these as a captain.  Captain Kallmayer testified regarding his own parking habits and the parking options available to other officers.  

Captain Kallmayer stated he uses various parking arrangements at the University depending on how long he will be there.  If he will only be at police headquarters for a short time, he will park his personal vehicle in the spaces reserved for police vehicles.  This option is available for all police officers.  Sometimes he would ride with his wife to work, and she would drop him off and pick him up.  If there is space available, officers can "park at the curb on the city street without feeding a meter" within three blocks of the police station.  Captain Kallmayer admitted during the nine months of the year when the University is in session, "there is [
sic
] rather limited opportunities to park curbside in free parking spaces."  Kallmayer stated however, metered spaces are fairly readily available "whenever you look for one."  Kallmayer further testified there is on-street parking in the area within a block or two of the public safety building in which all-night parking is allowed.  He indicated, however, he did not believe the City of Urbana lot at Sixth Street and Green Street was available for overnight parking.  On cross-examination, Captain Kallmayer admitted he did not often have to find parking for his personal vehicle because the University provides him with a take-home squad car.

Terry Ruprecht, associate provost and academic facilities officer, testified he oversees the facility management and scheduling department, which manages space and the matching of courses and events on campus.  Ruprecht is also heavily involved in the planning of new facilities.  Ruprecht stated academic programs and the buildings that house them are tied to the issues of parking availability and parking fees because many new buildings are constructed on surface parking lots.  Thus, as the result of constructing a new building, parking spaces are often lost.  

According to Ruprecht, the University has been building parking garages to replace the lost spaces, but they are not funded by the State of Illinois because the parking division is an auxiliary unit.  Further, as an auxiliary unit, the parking division does not get money from the general university budget but rather gets its money from bonds or parking fees.  The parking facilities, at least theoretically, pay for themselves.

Robert Todd next testified for the University.  Todd is associate vice president for administration and human resources and has been employed by the University for 27 years.  Todd’s area of responsibilities includes human resources, capital programs, and auxiliary services on each of the three campuses.  All three campuses have master plans for parking.  Todd stated the University tries to get parking as close to where people work as can reasonably be done.  Parking structures have to be financed through the selling of auxiliary bonds, usually for a 20- to 30-year term.  The bonds must be paid through revenue generated by the Parking Department.  To get a bond issued, the Board of Trustees needs approval by underwriters, and therefore, the bond must demonstrate a reliable income stream.  

Todd stated there is no benefit to the University to bargain over the FOP's proposal the University should provide bargaining unit members with parking spaces or, alternatively, to reimburse those members for the cost of spaces.  Todd indicated the University could not guarantee parking spaces to any particular bargaining unit and there would be considerable difficulty in setting parking rates for the various bargaining units so there would be equality of treatment among the employees.  Further, the University needs to know what the income stream will be from the fees that are charged so the bonds can be properly financed.  Because different bargaining units have different length contracts and have different negotiation times, granting one set of employees parking privileges in a contract would affect the parking privileges for all other employees.  Todd stated the current system affords all employees the same parking treatment.

The University next called A.G. Monaco, the director of labor relations for Southern Illinois University and the former director of human resources for SIU-E.  Monaco stated he is familiar with the University campus.  Monaco described the SIU-E campus and how the two campuses differ.  According to Monaco, the SIU-E campus covers approximately 2,660 acres, with all of the classrooms and administration buildings located on 200 acres in the center of that property.  It is approximately 1 1/2 miles from Interstate 270 and another 1 1/2 miles from the beginning of the campus to the buildings on campus.  Further, downtown Edwardsville is about three miles from the "gate" of the campus.  Unlike the University campus, which has residential areas in and around the campus and is interspersed with the neighborhoods and retail businesses, the SIU-E campus has no residential areas between the interstate highway and the beginning of campus.  Further, the SIU-E campus does not have any retail businesses, and all the parking on the campus is provided by the university. 

On cross-examination, Monaco stated on the SIU-E campus, the police park in university facilities and pay for parking.  The yearly rate is $70 for the lot.  Monaco also stated students pay about $50 a year to park in the most distant lots and most employees park in the "blue" lots for a $70 rate.  Further, the SIU-E campus has "green" lots right behind major classroom buildings, and both students and employees pay $100 for those lots.

Pamela Voitik was the last witness for the University.  Voitik testified she is the assistant vice chancellor of administration human resources and director of the division of campus parking and transportation for the University.  Voitik has oversight for the division of campus parking and transportation and related issues.  

According to Voitik, location of parking has an impact on the traffic and transit flow through campus.  The majority of parking spaces on campus are surface facilities that are rented out on an annual basis to students, faculty, and staff.  Voitik stated the University has developed a master parking plan for the campus.  The general goals of the parking plan were to minimize loss of spaces and to try to get as many people as possible as close as possible to the location of their job.

Voitik stated the University campus has a shuttle facility and the MTD provides shuttle service from remote lots.  The remote parking with the shuttle bus is open to all students, faculty, and staff at a rate of $80 per year.  Voitik testified University employees could take MTD buses, which are free to faculty and staff, to work.  The MTD service covers approximately five to seven miles from the center of campus, and the buses stop approximately every two blocks on campus.  Voitik stated the University pays more than $500,000 per year for the free passes and the University uses its parking revenue to pay that cost.    

Voitik stated employees could also purchase hang tags for lot-specific parking, which guarantee a spot in a particular lot.  The parking fees are the same for a surface lot and a structure lot.  Second- and third-shift parking is available at $75 per year, but first-shift parking costs $345 per year.  Voitik testified to the extent of her knowledge, adequate space  is available for the police officers who have requested tags for the lot near the public safety building and no police officer has ever been turned down.

On September 23, 2003, the ALJ issued his recommended decision and order, finding in favor of the FOP.  Specifically, the ALJ determined under the Act, the FOP’s parking proposal involved terms or conditions of the employment and the proposal did not involve the University’s inherent managerial authority.  The ALJ therefore concluded the parking proposal concerned a mandatory bargaining subject.  Upon receiving the above order, the University filed exceptions to the ALJ’s finding, claiming the ALJ’s determinations were erroneous.  In January 2004, the State Panel affirmed the ALJ’s finding, stating:

"After reviewing the record, exceptions, oral arguments[,] and briefs, we agree with the [ALJ] that the [University] violated the Act when it failed and refused to bargain over the [FOP's] proposal regarding employee parking, as we also find that topic is a mandatory subject of bargaining."  

This appeal followed.

II. ANALYSIS

On appeal, the University argues (1) the agency erred in finding that parking and parking fees are terms or conditions of the police officers’ employment; (2) the agency erred in finding that parking and parking fees were not matters of the University’s inherent managerial authority; and (3) as parking or parking fees are matters of inherent managerial authority, the University need not bargain with the FOP because the burden upon the University outweighs the benefits of bargaining.  Respondents assert the ALJ and the State Panel correctly determined the FOP’s parking proposal concerns terms or conditions of the police officers’ employment and parking is a matter that is outside of the University’s inherent managerial authority.  

Section 10(a)(4) of the Act provides:
 "(a) It shall be an unfair labor practice for an employer or its agents:

* * *

(4) to refuse to bargain collectively in good faith with a labor organization which is the exclusive representative of public employees in an appropriate unit ***."  5 ILCS 315/10(a)(4) (West 2000).

Section 7 of the Act states:
 "A public employer and the exclusive representative have the authority and the duty to bargain collectively [as] set forth in this [s]ection.

For the purposes of this Act, 'to bargain collectively' means *** to negotiate in good faith with respect to wages, hours, and other conditions of employment, not excluded by [s]ection 4 of this Act ***."  5 ILCS 315/7 (West 2000).

Section 4 of the Act provides, in relevant part, as follows:
 "Employers shall not be required to bargain over matters of inherent managerial policy, which shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, the organizational structure[,] and selection of new employees, examination techniques and direction of employees.  Employers, however, shall be required to bargain collectively with regard to policy matters directly affecting wages, hours[,] and terms and conditions of employment ***."  5 ILCS 315/4 (West 2000). 

In 
Central City Education Ass'n v. Illinois Educational Labor Relations Board
, 149 Ill. 2d 496, 599 N.E.2d 892 (1992), the Supreme Court of Illinois prescribed a three-part test for determining whether a matter is a mandatory subject of bargaining.  The first issue is whether the matter is one of wages, hours, or other terms and conditions of employment. 
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.  If not, the employer has no duty to bargain the issue.  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.  If the answer is yes, then the second issue is whether the matter is one of inherent managerial authority.  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.  If not, then no duty to bargain arises.  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.  If the matter is within the inherent managerial authority of the employer, then the third step must be reached, which involves weighing the benefits of bargaining against the burdens that would be imposed on the employer's authority.  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.  If the burdens outweigh the benefits, the issue is a nonmandatory subject of bargaining.  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.

A. Standard of Review

The issue here is whether the ALJ and the State Panel correctly determined the University’s refusal to bargain over the FOP’s parking proposal constituted an unfair labor practice under the Act.  

The Supreme Court of Illinois stated in 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205, 692 N.E.2d 295, 302 (1998), the issue of whether a pubic employer is required to bargain over a specific subject involves a mixed question of law and fact, and the applicable standard of review is "clearly erroneous."  Specifically, the supreme court explained that the term "wages, hours, and other conditions of employment" is a legal term that requires interpretation and 
an agency’s determination of a mandatory bargaining subject also involves the factual consideration of whether the bargaining subject in question affected "wages, hours, and other conditions of employment."  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  Under the "clearly erroneous" standard of review, an agency decision will be reversed only where the reviewing court, on the entire record, is "'left with the definite and firm conviction that a mistake has been committed.'"  
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 395, 763 N.E.2d 272, 282 (2001), quoting 
United States v. United States Gypsum Co.
, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).  The supreme court also stated that, not withstanding the "clearly erroneous" standard of review, an agency’s factual findings should be afforded a great deal of deference and will not be reversed on appeal unless such findings were against the manifest weight of the evidence.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302. 

B. Parking and Parking Fees as Terms or Conditions of Employment 

The University first argues the agency erred in finding parking and parking fees are terms or conditions of the police officers’ employment.  Specifically, the University argues that "employees are not required to drive to work" and the police officers have "numerous feasible alternatives for getting to work other than by driving and parking on university lots."  Respondents assert the ALJ correctly concluded that parking concerns the term or condition of the police officers' employment.

In 
Vienna School District No. 55 v. Illinois Educational Labor Relations Board
, 162 Ill. App. 3d 503, 507, 515 N.E.2d 476, 479 (1987), this court defined "term or condition of employment" as "something provided by an employer which intimately and directly affects the work and welfare of the employees" and affirmed the IELRB’s finding the school district’s failure to provide annual incremental salary increases constituted unfair labor practices.  The Supreme Court of Illinois stated that whether a matter involves "wages, hours, and terms and conditions of employment" is a question that a labor board is "uniquely qualified to answer" because of its experience and understanding of bargaining in the labor relations.  
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.  Similarly, in 
Ford Motor Co. v. National Labor Relations Board
, 441 U.S. 488, 494, 60 L. Ed. 2d 420, 426, 99 S. Ct. 1842, 1847-48 (1979), the United Stated Supreme Court also gave a labor board’s "terms and conditions of employment" determination a great deal of deference.  In that case, the Supreme Court declared, "we accept the Board’s view that in-plant food prices and service are conditions of employment" and concluded that food prices at a factory cafeteria and vending machines 
were mandatory subjects of bargaining.  
Ford Motor Co.
, 441 U.S. at 501, 60 L. Ed. 2d at 431, 99 S. Ct. at 1851.   

In the instant case, the ALJ’s "terms and conditions of employment" determination was based on the testimony at the October 30, 2002, hearing.  Specifically, the ALJ considered the testimony that most of the University police officers drive to work and parking is a big concern for all of them.  In addition, the officers testified having a parking space near their work is important because of the nature of the police work and their frequent and unpredictable overtime assignments.   

The ALJ also found the alternative parking arrangements for the police officers are inadequate, inconvenient, and unreliable.  The ALJ determined even though free parking opportunities exist near the police stations, the record demonstrates that during the approximately three-month period when regular classes are not in session at the campus, free-parking opportunities were, "at best, very difficult to locate."  During the nine­-month period when classes are held, such free parking opportunities were "impossible to locate."  Further, although metered parking spaces were available, users must periodically pay the meter every several hours or risk getting a parking ticket.  

Based on the above findings, the ALJ found parking is a subject that "intimately and directly affects the work and welfare of the employees" and, therefore, concerns terms or conditions of the police officers’ employment.  See 
Vienna School District
, 162 Ill. App. 3d at 507, 515 N.E.2d at 479.  Such a finding is not clearly erroneous. 

Further, the ALJ correctly concluded the availability of alternative parking arrangements, by itself, does not determine whether parking is a mandatory bargaining subject.  As this court’s definition of "term or condition of employment" in 
Vienna School District
, 162 Ill. App. 3d at 507, 515 N.E.2d at 479, demonstrates, the determination of whether something "intimately and directly affects the work and welfare of the employees" does not depend on the availability of alternative arrangements.  

Moreover, the United Stated Supreme Court held in 
Ford Motor Co.
, 441 U.S. at 494, 60 L. Ed. 2d at 426, 99 S. Ct. at 1847-48, the availability of alternative services was neither determinative nor by itself sufficient to determine whether a subject was a mandatory bargaining subject.  

Because the ALJ’s factual findings were not against the manifest weight of the evidence and because the ALJ’s legal determination was based on the correct interpretation of the term "terms and conditions of employment," the ALJ’s conclusion parking and parking fees are terms or conditions of the police officers’ employment was not "clearly erroneous."  As a result, this court is required to give deference to and affirm the agency’s determination on that issue.   

     C. The University’s Inherent Managerial Authority 

As the United Stated Supreme Court stated in 
Ford Motor Co.
, 441 U.S. at 498, 60 L. Ed. 2d at 429, 99 S. Ct. at 1850, quoting 
Fireboard Paper Products Corp. v. National Labor Relations Board
, 379 U.S. 203, 223, 13 L. Ed. 2d 233, 246, 85 S. Ct. 398, 409 (1964) (Stewart, J., concurring, joined by Douglas and Harlan, JJ.), matters of inherent managerial authority are those that "'lie at the core of the entrepreneurial control.'"  In the instant case, the ALJ found the record demonstrated the FOP’s parking proposal does not concern matters within the University’s inherent managerial authority.  Such a finding is clearly erroneous. 

The University is in the business of higher education. Terry Ruprecht, the associate provost and academic facilities officer, testified the mission of the University of Illinois is teaching, researching, public service, and economic development.  This testimony is also consistent with the University’s mission statement.  The witnesses for the University acknowledged parking facilities, unlike academic buildings, are considered auxiliary units and do not receive state funding.  Yet parking cannot be deemed to be totally subordinate to the University’s mission.  The control of an income stream from parking; the control of land use; the equal treatment of employees, faculty, and staff; and the need to consider the impact of bargaining with 16 other represented employee units clearly lie at the core of entrepreneurial control.  Further, the parking budget and parking locations are inextricably tied to the University's master plan, which is a necessity if the University is to fulfill its academic mission.  We conclude the FOP's parking proposal clearly concerns matters within the University's inherent managerial authority.

D. Burden-Benefit Balancing Test

We now turn to the application of the third part of the 
Central City
 test.  The third part of the test requires balancing the benefits of bargaining with the resulting burdens on the employer's authority.  This is a fact-specific undertaking, for which the Board is "eminently qualified."  See 
Central City
, 149 Ill. 2d at 523, 599 N.E.2d at 905.

The problem here is neither the ALJ nor the State Panel addressed this issue because both found parking and parking fees are terms and conditions of employment and that parking and parking fees were not matters of the University's inherent managerial authority.  The State Panel apparently believed it was not then necessary to do that balancing.

The State Panel suggests if balancing is required, the proper course of action is to remand the matter to the State Panel.  The FOP argues in its brief that if this court were to engage in a benefits-burden test, the outcome would surely be in favor of mandatory bargaining.  The University contends the overwhelming weight of the evidence presented shows the burden bargaining will impose on the University's authority far exceeds any benefit that might accrue to the employees, to the University, or to the process.

We agree with the University.  We find no reason for remand.  All the evidence presented proves mandatory bargaining of this issue would be a significant burden on the University, with only limited benefits.  The same analysis we applied to the inherent-managerial-authority issue applies here as well.  This university, with thousands of students and employees, controls many acres of land and must plan for the most efficient and cost- effective use of that land for the present and the future.  The existence, location, and cost of parking are components of the University conducting its day-to-day business and fulfilling its mission as well as integral to future land use.

III. CONCLUSION

We reverse the State Panel's decision and hold the issue of parking in this cause is not a mandatory subject for bargaining.

Reversed.

TURNER, J., concurs.

MYERSCOUGH, J., dissents.

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent.  I agree that the ALJ and the State Panel correctly found that parking and parking fees are terms or conditions of the police officers' employment.  I believe, however, the ALJ and the State Panel also correctly concluded that the FOP's parking proposal does not concern matters within the University's inherent managerial authority.  Therefore, I would affirm the agency's determination that the University was required to bargain with the FOP.

As the majority correctly points out, this court reviews an agency's mixed-law-and-fact determination under the "clearly erroneous" standard of review.  As a result, this court is required to give great deference to the State Panel's decision and reverse only where we are "'left with the definite and firm conviction that a mistake has been committed.'"  
AFM Messenger
, 198 Ill. 2d at 395, 763 N.E.2d at 282, quoting 
United States Gypsum Co.
, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542. In the instant case, the record clearly demonstrated that the State Panel's inherent-managerial-authority determination was reasonably based on the relevant testimony.  Such a determination was not "clearly erroneous" and should be affirmed.

The Act states that matters of inherent managerial policy "shall include such areas of discretion or policy as the functions of the employer, standards of services, its overall budget, [and] the organizational structure and selection of new employees."  5 ILCS 315/4 (West 2000).  Although the above sentence does not contain an exhaustive list of matters of inherent managerial policy, it provides guidance on the interpretation of the term in question and indicates that matters of inherent managerial policy denote something that affects the employer on a large scale and relates to the employer's essential operation.

Such a reading is consistent with the United States Supreme Court's holding in 
Ford Motor Co.
, which states matters of inherent managerial authority are those that "'lie at the core of the entrepreneurial control.'"  
Ford Motor Co.
, 441 U.S. at 498, 60 L. Ed. 2d at 429, 99 S. Ct. at 1850, quoting 
Fireboard Paper Products
, 379 U.S. at 223, 13 L. Ed. 2d at 246, 85 S. Ct. at 409 (Steward, J., concurring, joined by Douglas and Harlan, JJ.).  In that case, the Court concluded that the determination of company food prices and services was not a managerial decision that lies in the core of entrepreneurial control because "the company is not in the business of selling food to its employees."  
Ford Motor Co.
, 441 U.S. at 498, 60 L. Ed. 2d at 429, 99 S. Ct. at 1850.  In the instant case, the University is in the business of higher education and not in the business of selling parking spaces to its employees.  Therefore, similar to company food prices, parking arrangements for the policy officers is also not a managerial decision that lies at the core of University's entrepreneurial control.

The record shows that Terry Ruprecht, the associate provost and academic facilities officer, testified that the mission of the University of Illinois is teaching, researching, public service, and economic development.  This testimony is consistent with the University's mission, which states that the University "strives constantly to sustain and enhance its quality in teaching, research[,] and public service."  The University's witnesses further acknowledged that parking facilities, unlike academic buildings, are considered auxiliary units and do not receive state funding.  None of these testimonies shows that University employees' parking arrangements affect the University's mission.

In finding the State Panel's decision was "clearly erroneous," the majority links parking arrangements for police offices to the University's master plan and overall budget and claims that the parking is integral to the University's mission.  In so concluding, the majority finds that "[t]he control of an income stream from parking; the control of land use; the equal treatment of employees, faculty, and staff; and the need to consider the impact of bargaining with 16 other represented employee units clearly lie at the core entrepreneurial control."  Slip op. at 19.  The majority fails to recognize, however, negotiating over any subject matter with any employee unit impacts the equal treatment of the employees and has an impact on the negotiation with other bargaining units.  Therefore, the fact that the University would be required to negotiate with other employee representative units regarding respective parking arrangements does not automatically make the parking arrangement a subject that is integral to the University's mission.  Moreover, the Supreme Court of United States in 
Ford Motor Co.
, 441 U.S. at 498, 60 L. Ed. 2d at 429, 99 S. Ct. at 1849-50, found that the establishment of a cafeteria and the determination of company food prices were not managerial decisions that lie at the core of entrepreneurial control despite the fact that such a matter concerns the control of the income stream from the food sales and use of land for the cafeteria.  Here, the relevant testimony at the hearings established that parking arrangements were not part of the University's essential operation and were subordinate to the University's mission.  As a result, the State Panel correctly concluded that parking arrangement for the police officers does not "lie at the core of the [University's[ entrepreneurial control."

For these reasons, I would affirm the State Panel's findings entirely.