ADAMS FARM *et al.*, Plaintiffs-Appellees, v. BECKY DOYLE, Director, The Department of Agriculture, *et al.*, Defendants-Appellants (Alverda Bastien *et al.*, Defendants).

Fourth District   Nos. 4—97—1096, 4—98—0268 cons.

Argued April 21, 1999.—Opinion filed March 28, 2000.

482

MYERSCOUGH, J., dissenting.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Paul Racette (argued), Assistant Attorney General, of counsel), for appellants.

Raymond J. Watson, Jr. (argued), of Springfield, for appellees.

PRESIDING JUSTICE COOK delivered the opinion of the court:
The circuit court of Livingston County, sitting in administrative review, reversed a decision of the Department of Agriculture (Department). The Department had held that the assets of a failed grain dealer must be used to reimburse the Illinois Grain Insurance Fund for payments made by the fund to grain producers before the dealer's assets could be used to pay the balance of the producers' claims. However, the circuit court also awarded plaintiffs $27,015 in attorney fees and costs. Defendants, the Department and its Director, appeal the circuit court's ruling on the reimbursement issue (No. 4—97—

1096) and the attorney fee award (No. 4—98—0268). In No. 4—97—1096, we reverse the decision of the circuit court and remand with instructions to affirm the decision of the Department; in No. 4—98—0268, we reverse.

In December 1991, the Department determined that the Blackstone-Sunbury-Nevada Grain Co., Inc. (Blackstone), located in Dwight, Illinois, did not have sufficient financial resources to guarantee payment to grain producers. The Department accordingly suspended Blackstone's grain dealer license and grain warehouse license.

On February 26, 1992, a Department hearing officer commenced a hearing to determine the validity, category, and amount of each claim filed against Blackstone. On April 29, 1992, the hearing officer issued his order, listing claimants and claims totaling $931,304.50 (the merchandising claimants). The order listed two categories of merchandising claimants, the first with claims totaling $654,752.64. A second category of merchandising claimants, whose claims totaled $276,551.86, was potentially barred under section 307 of the Grain Dealers Act (Ill. Rev. Stat. 1989, ch. 111, par. 307 (as amended, 225 ILCS 630/6.1 (West 1992)), which barred claims where the grain producer had not requested payment within 160 days of the date of sale or within 270 days after the date of delivery. The order also listed claimants who held warehouse receipts; those claims totalled $112,428.37.

As part of the process of enforcing statutory lien claims and distributing proceeds to grain producers, the Department opens a specific bank account, the Grain Indemnity Trust Fund (Trust Fund), for each failed grain dealer. Ill. Rev. Stat. 1989, ch. 114, par. 702 (defining "grain indemnity trust fund") (as amended, 240 ILCS 25/2 (West 1992)). The Department places the liquid grain assets of the failed grain dealer in this Trust Fund and, if other grain assets are subsequently liquidated, adds those assets to the Trust Fund. Ill. Rev. Stat. 1989, ch. 114, par. 702 (defining "grain assets") (as amended, 240 ILCS 25/2 (West 1992)). The Illinois Grain Insurance Act (Act) also created the Illinois Grain Insurance Fund (Insurance Fund), maintained by assessments on grain dealers, grain warehousemen, and other specified licensed entities. Ill. Rev. Stat. 1989, ch. 114, par. 705 (as amended, see 240 ILCS 25/5 (West 1992)).

The hearing officer held that the merchandising claimants were entitled to be compensated for 85% of their valid claims to a maximum of $100,000 pursuant to section 8(a) of the Act (Ill. Rev. Stat. 1991, ch. 114, par. 708(a) (now 240 ILCS 25/8(a) (West 1992)). The order also held that the second category of merchandising claimants, the claims

totaling $276,551.86, was entitled to 85% compensation under section 8(a). The order concluded that the assets of the failed grain dealer were to be applied first to the valid claim amounts of merchandising claimants and warehouse receipts claimants under section 8. Any shortfall would then be requested from the Insurance Fund.

On May 28, 1992, many of the merchandising claimants, the plaintiffs in this case, filed a petition for reconsideration, arguing they should receive the 15% unpaid balances of their claims first, from any subsequently liquidated grain assets of Blackstone, prior to any payments from those assets to the Insurance Fund to reimburse the Insurance Fund for monies already advanced to the claimants. The Director denied that petition on June 29, 1992.

In June 1992, $112,428.37 was paid out to the warehouse receipts claimants (100% of the amount claimed), and $791,608.83 was paid out to the merchandising claimants, a total of $904,037.20. The claims of the two categories of merchandising claimants totaled $931,304.50, and 85% of that total amounted to $791,608.83. The remaining 15%, which is in dispute in this case, amounts to $139,695.68 for all merchandising claimants, but not all of those claimants are plaintiffs. The total amount in dispute for plaintiffs is $118,530.98. Of the total of $904,037.20 paid to merchandising claimants and to warehouse receipts claimants, $711,000 was advanced by the Insurance Fund. Of that $904,037.20 total, $193,037.20 came from Blackstone's then-liquidated grain assets. If Blackstone's liquidated grain assets were applied first to the 15% unpaid balances, sufficient funds were accordingly immediately available to cover those unpaid balances. No evidence is in the record, but it is likely that additional Blackstone assets were subsequently liquidated and used to reimburse the Insurance Fund.

In July 1992, plaintiffs filed a complaint for administrative review in the circuit court of Livingston County. The circuit court reversed the Department's decision and in a later order awarded plaintiffs $27,015 in attorney fees and costs. The Director and the Department appeal.

■ An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct, and a reviewing court is limited to ascertaining whether such findings are against the manifest weight of the evidence. An administrative agency's findings on a question of law, on the other hand, are not binding on a reviewing court and are reviewed *de novo*. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05, 692 N.E.2d 295, 302 (1998). However, based on an agency's experience and expertise, a court may give substantial weight and deference to

the agency's interpretation of an ambiguous statute it administers and enforces. *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 474, 702 N.E.2d 529, 531 (1998). We review this case as a question of law.

## I. REIMBURSEMENT OF THE INSURANCE FUND

■ Plaintiffs quote language from section 8(a) of the Act to support their position that the Insurance Fund will pay 85% of the claim and the 15% balance shall be paid from the assets of the elevator:

> "(a) Any claimant who has incurred a financial loss due to a failure of a grain dealer shall be entitled to be compensated for 85% of a valid claim, to a maximum of $100,000, with monies from the [Insurance Fund]. To the maximum extent that funds are or may be made available for such purpose, the remaining balance of such claim shall be paid by the Department from the assets and other security of the failed grain dealer ***." Ill. Rev. Stat. 1991, ch. 114, par. 708(a) (now 240 ILCS 25/8(a) (West 1992)).

Plaintiffs argue from this language that the Insurance Fund is the fund of first resort and the 85% figure is only a limitation on how much of the claim the Insurance Fund will pay quickly, not a limitation on how much of the claim will be eventually paid. Plaintiffs' argument ignores the language of section 8 preceding that of section 8(a), that within 90 days of the approval of a valid claim the Department shall compensate any claimant *from the Trust Fund*. The Trust Fund, the assets of the failed grain dealer, is the fund of first resort.

The Department's Director points to other language that indicates Insurance Fund monies cannot be used if the effect is to bring the recovery above 85%. Insurance Fund monies can only be used "when necessary for the purpose of compensating claimants in accordance with the provisions of Section 8." Ill. Rev. Stat. 1991, ch. 114, par. 709(b) (now 240 ILCS 25/9(b) (West 1992)). The Act in general and section 8 in particular provide compensation for only "85% of a valid claim." Ill. Rev. Stat. 1991, ch. 114, par. 708(a) (now 240 ILCS 25/8(a) (West 1992)). Insurance Fund monies "shall not be available for any purpose other than the payment of claims pursuant to this Act" and may only be transferred to the Trust Fund "when necessary to compensate claimants pursuant to this Act." Ill. Rev. Stat. 1989, ch. 114, par. 706 (declaring that if this provision is held invalid the entire Act is invalid) (as amended, see 240 ILCS 25/6 (West 1992)). The Director is required "to deposit into the [Trust Fund] any assets of a failed grain dealer or grain warehouseman *for the purposes of repayment of the [Insurance Fund] monies used to pay claimants*." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 114, par. 709(c) (now 240 ILCS 25/9(c) (West 1992)).

Plaintiffs' argument that the Insurance Fund is the fund of first resort, and that the 85% limitation is a limitation only on what must be paid quickly, within 90 days, is not persuasive. The primary reason for adoption of the Act was not that claimants were being paid late but that they were not being paid at all. The Director tells us that, under the prior law, which required grain dealers to keep surety bonds or certificates of deposit in force to provide protection to grain producers (see Ill. Rev. Stat. 1981, ch. 111, par. 303), merchandising claimants recovered only 13% of their losses; warehouse receipt claimants recovered only 19% of their losses. The statute affords no justification for concluding that the 85% limitation is a limitation only on what the claimants will quickly recover and not upon what they will ultimately recover.

Plaintiffs argue that under the Department's interpretation "the 15% balance will never be paid if as little as one dollar of the Grain Insurance Fund is used." A more accurate statement is that merchandising claimants will never receive more than 85% of their claim unless the assets of the failed grain dealer are equal to more than 85% of their claim. If the liquidated assets of the failed grain dealer total 85% of the claim, less one dollar, the Insurance Fund will pay the one dollar. If additional assets are subsequently liquidated, the Insurance Fund will be reimbursed the dollar, and all the additional assets will go to the grain producer, until 100% of the claim is paid.

The Act is hardly a model of clarity. Nevertheless, some features of the Act are clear: (1) grain producers are entitled to payment of their claims, to the extent provided, within 90 days (Ill. Rev. Stat. 1991, ch. 114, par. 708 (now 240 ILCS 25/8 (West 1992))); (2) the initial source of payment is the assets of the failed grain dealer, the Trust Fund (Ill. Rev. Stat. 1991, ch. 114, par. 708 (now 240 ILCS 25/8 (West 1992))); (3) the Insurance Fund never comes into play if the assets of the failed grain dealer are available to pay 85% of the claims within 90 days (Ill. Rev. Stat. 1991, ch. 114, par. 708(a) (now 240 ILCS 25/8(a) (West 1992))); and (4) grain producers are never harmed by the Act and the Insurance Fund is repaid from the assets of the failed grain dealer only to the extent that the Fund's monies have been used to pay claimants (Ill. Rev. Stat. 1991, ch. 114, par. 709(c) (now 240 ILCS 25/9(c) (West 1992))).

We see no reason to interpret the Act to eliminate in most cases the 85% limitation on claims not supported by warehouse receipts. These claims, merchandising claims, include "price-later contracts," under which, when the grain producer sells his grain, title passes to the grain dealer but the price is not established until some later time of the grain producer's choosing. Ill. Rev. Stat. 1989, ch. 114, par. 702

(defining "claimant") (as amended, see 240 ILCS 25/2 (West 1992)). Plaintiffs recognize that "price laters" entail risk. The Department argues that the speculation inherent in "price laters" has been the primary reason for elevator failures. See Comment, *Grain Elevator Bankruptcy—Has Illinois Successfully Provided Security to Farmers?*, 1983 S. Ill. U. L.J. 337, 341-42. The legislature rationally chose to limit coverage under the Act on these price-later contracts. Under plaintiffs' interpretation, claimants would receive 100%, not 85%, of their merchandising claims in all cases unless the assets of the failed grain dealer were less than 15% of the merchandising claims. Plaintiffs argue that, historically, merchandising claimants recovered only 13% of their losses, so claimants would usually receive less than 100% of their claim. It seems unlikely, however, that the legislature would go to all this effort for a varying discount that might be only 1% or 2%. The most logical view of the Act is that it calls for a fixed discount of 15%, reducible only if the assets of the failed grain dealer end up to be greater than 85%.

If the proposition is accepted that the assets of the failed grain dealer in the Trust Fund are the fund of first resort, plaintiffs' argument must fail. What sense would it make for claimants to have a recovery of 85% where the assets of the failed grain dealer are liquidated immediately, but a recovery of perhaps 100% where assets are subsequently liquidated? Where the assets are liquidated immediately, the Insurance Fund clearly will pay only what is necessary to bring the recovery up to 85%. Where the assets are to be subsequently liquidated, the Insurance Fund will advance what is necessary to bring the recovery up to 85% but is then entitled to reimbursement from the subsequently liquidated assets.

On May 9, 1984, Attorney General Neil Hartigan wrote an unpublished opinion letter to the Director, noting that confusion still existed regarding the proper compensation of merchandising claimants and concluding that the Insurance Fund must be reimbursed in full prior to compensation of the claimants in excess of 85%. The Attorney General stated that if the practical effect of the legislation is to provide 100% recovery to merchandising claimants, the absence of any risk could cause elevator managers and farmers alike to be more inclined to speculate, which was not the intent of the General Assembly. Plaintiffs are critical of this opinion letter. We conclude that the opinion is not binding on us, but that we may consider it if logically persuasive.

Effective January 1, 1996, the legislature enacted the Grain Code to replace a number of statutes, including the Grain Dealers Act and the Act, with a single code. The Grain Code makes clear that proceeds

realized from the failed licensee "shall be first used to repay the [Insurance Fund] for moneys transferred to the [Trust Fund]." 240 ILCS 40/25—20(d)(1) (West 1996). A court can properly consider a subsequent amendment to a statute to determine the legislative intent behind and the meaning of the statute prior to the amendment. *Chiczewski v. Emergency Telephone System Board*, 295 Ill. App. 3d 605, 608, 692 N.E.2d 691, 694 (1997). When an amendment follows a controversy concerning the interpretation of the original statute, courts will regard the amendment as a clarification of, rather than a change in, existing law. *Church v. State of Illinois*, 164 Ill. 2d 153, 163-64, 646 N.E.2d 572, 578 (1995); *Harris Bank St. Charles v. Weber*, 298 Ill. App. 3d 1072, 1079, 700 N.E.2d 722, 727 (1998). The Attorney General's letter shows a controversy arose concerning the interpretation of the Act. We hold that the enactment of the Grain Code was a clarification here.

Plaintiffs argue the purpose of the Act was to protect farmers, not to protect grain dealers from further assessments, as the Department is attempting to do here. The Act indicates that its purpose is to "improv[e] the economic stability of agriculture," as well as to "ensure the existence of an adequate fund." Ill. Rev. Stat. 1991, ch. 114, par. 701. The purpose of the Act is "to protect grain producers in the event of the financial failure of a grain dealer" (Ill. Rev. Stat. 1991, ch. 114, par. 701), but the Act specifically refers to a limitation of 85% on merchandising claims. We must determine the meaning of that 85% limitation as best we can and not abandon our inquiry in favor of full compensation because the purpose of the Act is to protect farmers. Plaintiffs' *ad hominem* attack on grain dealers and the Director is unfortunate. Farmers have clearly profited greatly from the Act as interpreted by the Director.

Plaintiffs argue their position is supported by a regulation (8 Ill. Adm. Code § 285.80 (1992-93) (eff. April 7, 1986)) that provides liquidated assets of the failed grain dealer that have been deposited in the Trust Fund shall be used as follows: (a) payment of claimants, (b) repayment of the Insurance Fund, and (c) payment to the failed grain dealer. The regulation is consistent with our analysis that the Trust Fund and the assets of the failed grain dealer are the fund of first resort in paying claimants. Only if that fund is insufficient is the Insurance Fund called upon to make a payment and then only to bring the claimant's recovery up to 85%. The regulation does not address the situation where the assets of the failed grain dealer are liquidated after the Insurance Fund has been called upon for payment.

## II. ATTORNEY FEES

A grain producer who notifies the Director of a grain dealer's

failure to pay "is entitled to the benefits of the grain dealer's bond." Ill. Rev. Stat. 1989, ch. 111, par. 307. Only grain producers who have requested payment from the grain dealer within 160 days of the date of sale or within 270 days after the date of delivery, however, are entitled to give such a notice. Ill. Rev. Stat. 1989, ch. 111, par. 307. With the adoption of the Act in 1983, surety bonds were no longer used for the protection of grain producers, who instead were afforded protection from the Insurance Fund, maintained by assessments on grain dealers. Due to an oversight, until January 1992 (as amended, Ill. Rev. Stat. 1991, ch. 111, par. 307 (now 225 ILCS 630/6.1 (West 1992))) the Grain Dealers Act continued to refer to the grain dealer's bond and not to the Insurance Fund. Some of the plaintiffs here argued that because the Grain Dealers Act did not specifically refer to the Insurance Fund until January 1992, after they had entered their price-later contracts and after Blackstone had failed, the 270-day requirement should not be applied to them. The hearing officer also noted that prior to March 13, 1989, regulations required that a statement be printed on the face of each price-later contract that the grain "is covered by a grain dealer's bond for a period of 160 days from the date of delivery or pricing, whichever is later, bond coverage not to exceed a maximum of 270 days." 68 Ill. Adm. Code § 600.80(a) (1985) (eff. January 5, 1984); amended at 13 Ill. Reg. 3665, eff. March 13, 1989 (see 68 Ill. Adm. Code § 600.80 (1992-93)). After considering plaintiffs' argument, the hearing officer decided that, due to the possible confusion under the circumstances, he would not apply the 270-day requirement in this case.

The circuit court stated that "plaintiffs were successful before the hearing officer as to the 'delayed[-]pricing rule' in challenging the [D]epartment's assertion of this 'rule' to deny certain claims." The circuit court apparently awarded attorney fees on the basis of this successful challenge, under section 14.1(b) of the Administrative Procedure Act (Procedure Act) (Ill. Rev. Stat. 1989, ch. 127, par. 1014.1(b) (as amended, Ill. Rev. Stat. 1991, ch. 127, par. 1010—55(b) (now 5 ILCS 100/10—55(c) (West 1992)))), which provides attorney fees "[i]n any case in which a party has any administrative rule invalidated by a court for any reason." See *Ardt v. State*, 292 Ill. App. 3d 1059, 687 N.E.2d 126 (1997), *appeal denied*, 176 Ill. 2d 569 (1998); *contra Citizens Organizing Project v. Department of Natural Resources*, No. 4—97—0851 (November 3, 1998) (unpublished order pursuant to Supreme Court Rule 23), *rev'd & remanded*, 189 Ill. 2d 593, 597-98 (2000). In the present case, the action was taken by the hearing officer, not by the circuit court. In the present case, no administrative rule was invalidated; rather, the hearing officer determined that it would be unfair

to apply the statute, as revised, to the parties in this case. A party is not entitled to attorney fees under section 14.1(b) simply because the Department agrees with him on an issue. Section 14.1(b) is designed to discourage the application of rules that the Department knows are likely to be invalidated if the matter ever reaches the circuit court. Even assuming an invalidation of a rule here, the Department did the right thing by "invalidating" the rule itself and not forcing plaintiffs to go to the circuit court.

Plaintiffs also argue that they are entitled to attorney fees under section 14.1(a) of the Procedure Act, which provides for attorney fees in noncourt cases given an "allegation made by the agency without reasonable cause and found to be untrue." Ill. Rev. Stat. 1989, ch. 127, par. 1014.1(a) (as amended, see 5 ILCS 100/10—55(a) (West 1992)). "Allegations" apparently refers to statements of fact. No such allegations or other statements are shown in this case. Even if we disagreed with the Director's determination that the assets of the failed grain dealer were to be applied first to reimburse the Insurance Fund, we could not say those statements were made without reasonable cause or that they were found to be untrue.

In *Kaufman Grain Co. v. Director of the Department of Agriculture*, 179 Ill. App. 3d 1040, 534 N.E.2d 1259 (1988), the Department argued that it had the right to settle disputes between grain producers and grain dealers under various statutes and that it had done so in the past. This court held that the statutes cited did not provide a basis for such adjudication by the Department, although the Department might have such authority if it had enacted administrative rules under those statutes specifically providing for such adjudication. *Kaufman*, 179 Ill. App. 3d at 1049, 534 N.E.2d at 1265. We held that the Department's practice amounted to the promulgation of an administrative rule, without complying with the Administrative Procedure Act, and that plaintiff was entitled to attorney fees under section 14.1(b), for " 'the agency's failure to follow statutory procedures in the adoption of the rule.' " *Kaufman*, 179 Ill. App. 3d at 1048, 534 N.E.2d at 1265, quoting Ill. Rev. Stat. 1985, ch. 127, par. 1014.1(b) (now 5 ILCS 100/10—55(c) (West 1992)). Plaintiffs argue that they are similarly entitled to fees here. We disagree. This case involves no dispute, as in *Kaufman*, over whether the Department has subject-matter jurisdiction. An administrative agency does not run afoul of rule-making restrictions when it simply interprets statutory language. *Kaufman*, 179 Ill. App. 3d at 1047, 534 N.E.2d at 1264 (adjudicated cases are a proper alternative method of announcing agency policies). The Department had a statutory basis for its ruling here. Therefore, we reverse the judgment for attorney fees and costs.

Accordingly, we reverse the decision of the circuit court on reimbursement and remand with instructions to affirm the order of the Department, and we reverse the March 1998 award of attorney fees and costs to plaintiffs.

No. 4—97—1096, Reversed in part and remanded with directions.
No. 4—98—0268, Reversed.

GARMAN, J., concurs.

JUSTICE MYERSCOUGH, dissenting:
I respectfully dissent.

## A. Reimbursement of the Insurance Fund

The preeminent rule of statutory construction is to give effect to the language and intent of the legislature. *People v. Hicks*, 164 Ill. 2d 218, 222, 647 N.E.2d 257, 259 (1995). The express legislative intent of the Act is as follows:

> "It is the purpose of this Act to promote the State's welfare by improving the economic stability of agriculture through the *establishment of the \*\*\* Insurance Fund* in order *to protect grain producers in the event of the financial failure of a grain dealer \*\*\* and to ensure the existence of an adequate fund so that grain producers and claimants may be compensated for losses* occasioned by the failure of a grain dealer \*\*\*." (Emphasis added.) Ill. Rev. Stat. 1991, ch. 114, par. 701(b) (now 240 ILCS 25/1(b) (West 1992)).

The clear legislative intent of the Act is to protect grain producers and to compensate claimants for their losses. Notwithstanding this clear legislative intent, the Department argues in essence that "ensur-[ing] the existence of an adequate fund" (Ill. Rev. Stat. 1991, ch. 114, par. 701(b) (now see 240 ILCS 25/1 (West 1992))) has priority over the protection of grain producers, especially merchandising claimants. This argument, however, ignores the balance of the sentence, which makes clear that the Insurance Fund exists for one purpose: "so that grain producers and claimants may be compensated for losses." Ill. Rev. Stat. 1991, ch. 114, par. 701(b) (now see 240 ILCS 25/1(b) (West 1992)). Clearly the purpose behind the Act was to protect fully all grain producers from losses caused by a failed grain dealer:

> "Brummer: 'You mean the ... the individual recovers 100 percent of the loss?'
>
> Richmond: 'He would recover 85 percent that's covered in this Fund, and then the assets in a bankruptcy ...'
>
> Brummer: 'So, in effect, there's a 15 percent coinsurance, if you will, or a 15 percent of the loss ...'

Richmond: '*** [T]he warehouseman is covered 100 percent. And those who are covered the 85 percent is by the dealer ... in the dealer's situation. The additional 15 percent could very well be brought to zero as a result of the liquidation of the bankrupt assets.' " 83d Ill. Gen. Assem., House Proceedings, June 27, 1983, at 307-08 (Statements of Representatives Brummer and Richmond).

Moreover, two *specific* provisions in the Act already ensure the continued existence of an adequate fund without the necessity of shorting any of the grain dealers. Section 5(d) of the Act requires that additional grain dealer fees be assessed if the Insurance Fund balance falls below $3 million. Ill. Rev. Stat. 1989, ch. 114, par. 705(d) (as amended, 240 ILCS 25/5(d) (West 1992)). In addition, section 7 of the Act mandates that, in the event the Insurance Fund is insufficient to pay all approved claims, the General Assembly shall appropriate money to the Insurance Fund to pay all valid claims. Ill. Rev. Stat. 1991, ch. 114, par. 707 (now 240 ILCS 25/7 (West 1992)).

Nevertheless, instead of using the express statutory mechanisms provided to ensure the existence of an adequate fund, the Department creates a third method by reading risk distribution principles into the statute that are not readily evident in the plain language, using rationales based on the history of the grain industry. In short, the Department asks this court to stand the statute on its head and prioritize the Insurance Fund over the people whom the fund was created to protect.

The plain and ordinary meaning of section 8(a) requires that claimants be "compensated for 85% of a valid claim *** *with monies from the Illinois Grain Insurance Fund.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 114, par. 708(a) (now 240 ILCS 25/8(a) (West 1992)). Section 8(a) also mandates that, "[t]o the maximum extent that funds are or may be made available for such purpose, *the remaining balance* of [their] claim *shall be paid by the Department from the assets and other security of the failed grain dealer.*" (Emphasis added.) Ill. Rev. Stat. 1991, ch. 114, par. 708(a) (now 240 ILCS 25/8(a) (West 1992)). The Department's interpretation, however, requires that claimants be initially compensated for 85% of a valid claim *with monies from the* failed grain dealer's liquidated assets in the *Trust Fund and the remaining balance* of their claims *out of the Insurance Fund.* This conclusion is the exact opposite of the plain language in the statute.

The Department attempts to minimize this peculiar conclusion by asserting that the language preceding section 8(a) dictates that all claims be initially paid out of the Trust Fund. That language, however, only imposes a 90-day time limit on the Department to pay all valid claims from the Trust Fund. It does not contradict section 8(a). It does

not state that the Trust Fund is the fund of first resort. It does not state that the Insurance Fund has priority over the liquidated assets of the failed grain dealer.

The Department's interpretation of the Act, therefore, is not only contrary to the plain reading of the statute, it is also inconsistent with the legislative intent to compensate claimants because it effectively prioritizes the Insurance Fund over the people whom the Insurance Fund was created to protect.

The Department's regulation regarding liquidated assets also supports claimants:

> "Proceeds from liquidated *** assets of the failed grain dealer *** which the Department has deposited in the Grain Indemnity Trust Fund *** shall be used for the purposes and payments *as follows*:
>
>> (a) A claimant under Section 8(a) and (b) of [t]he Illinois Grain Insurance Act.
>>
>> (b) Repayment to the Illinois Grain Insurance Fund as set forth in Section 9(c) of [t]he Illinois Grain Insurance Act.
>>
>> (c) Any funds *remaining* in the Grain Indemnity Trust Fund shall be paid to the failed grain dealer *** after the payments have been made as set forth in 8 Ill. Adm. Code 285.90 (a) and (b)." (Emphasis added.) 8 Ill. Adm. Code § 285.80 (1992-93) (eff. April 7, 1986).

The language "shall be used for the purposes and payments *as follows*" (emphasis added) (8 Ill. Adm. Code § 285.80 (1992-93) (eff. April 7, 1986)) indicates a clear prioritization of the Trust Fund: (a) claimants, (b) repayment of the insurance fund, and (c) *any funds remaining* to the failed grain dealer.

Additionally, the Illinois Administrative Code clearly indicates that the fund of first resort is the Insurance Fund and not the Trust Fund. Section 285.90 of Title 8 states that it is the priority of the "[Insurance] Fund and not with the assets of the Grain Indemnity Trust Fund" to pay all "valid claims of claimants who are entitled to payment under Section 8(a) of [t]he Illinois Grain Insurance Act." 8 Ill. Adm. Code § 285.90 (1992-93) (eff. April 7, 1986).

Moreover, this language in the statute, the Illinois Administrative Code, and the legislative history make clear that the 1996 amendment reflects a change in the law rather than a clarification. *Cf. Church*, 164 Ill. 2d at 163-64, 646 N.E.2d at 578; *Harris Bank St. Charles*, 298 Ill. App. 3d at 1079, 700 N.E.2d at 727.

## B. Attorney Fees

The Department argues that the record is clear that the hearing officer did not actually invalidate the 270-day delayed-pricing rule; he

simply did not apply it based on the circumstances of the case. I agree. The hearing officer did not invalidate the rule; the circuit court did. Therefore, the claimants are entitled to attorney fees and costs under section 10—55(c) of the Procedure Act because the Department failed to promulgate the 270-day time-limitation rule relating to Insurance Fund claims consistent with the statutory procedures required. Ill. Rev. Stat. 1991, ch. 127, par. 1014.1(b) (as amended, 5 ILCS 100/10—55(c) (West 1996)).

In 1983, the Department approved and published price-later contracts that, either purposefully or erroneously, omitted the required 270-day time-limitation notice (see 68 Ill. Adm. Code § 600.80(a) (1985) (eff. January 1, 1979 (emergency rule adopted at 3 Ill. Reg. 43, 52))) relating to claims against bonds on the face of all price-later contracts. Then, in 1989, the Department passed new regulations and declared that the time frames were no longer required to be printed on the face of price-later contracts because "the establishing of time periods no longer has the importance that it once did for protecting depositors' interests nor are time requirements necessary." See 13 Ill. Reg. 3665, 3666 (eff. March 13, 1989) (summary and purpose of amendments); see also 13 Ill. Reg. 3672-74, amending 68 Ill. Adm. Code § 600.80 (1985) (eff. January 5, 1984) (price-later contracts) and adding 68 Ill. Adm. Code § 600.90 (1992-93) (printing price-later contracts) (eff. March 13, 1989).

The 270-day rule and its reference to bonds, however, was neither modified nor eliminated from the grain dealers' statute until January 1992, when the Act was finally amended to include a reference to the Insurance Fund, instead of bonds. Compare Ill. Rev. Stat. 1989, ch. 111, par. 307, with Ill. Rev. Stat. 1991, ch. 111, par. 307 (as amended by Pub. Act 87—262, § 1, eff. January 1, 1992 (1991 Ill. Laws 1681, 1686)) (now see 225 ILCS 630/6.1 (West 1992)). Claimants were clearly correct, therefore, in challenging the hearing officer's preliminary ruling that the 270-day time restriction applied to Insurance Fund claims because, at that point in time, no regulations or statutes existed authorizing such a rule.

Additionally, but for the timely challenge by claimants, the Department would have applied a 270-day time restriction to claims against the Insurance Fund without statutory or regulatory authorization to do so. The circuit court justifiably ordered attorney fees and costs for claimants' successful challenge of the Department's 270-day rule as it would have applied to Insurance Fund claims because the court found, consistent with section 10—55(c) of the Procedure Act, that the Department failed to follow statutory procedures in the adoption of the rule.

The claimants properly challenged a rule in an administrative proceeding that had not been properly promulgated. The circuit court subsequently found that the 270-day rule, as it related to Insurance Fund claims, was improperly promulgated. The claimants, therefore, are entitled to fees under section 10—55(c). The circuit court's invalidation of the hearing officer's determination that the rule was still valid, even though not applied, dictates such an award. To rule otherwise would allow administrative agencies to impose new rules without restraint and without consequences, so long as the agency chooses not to apply the rule when challenged in an administrative hearing.

In *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 597-98 (2000), the Supreme Court of Illinois held the award of attorney fees and expenses to be mandatory where an administrative rule has been invalidated by a court, regardless of which party prevailed on any other aspect of the case. The court stated:

> "If you are a party who has brought *any* case and you succeed in that case in having *any* administrative rule invalidated by a court for *any* reason, you are entitled to recover all of your reasonable litigation expenses, including attorney fees." (Emphasis in original.) *Citizens Organizing Project*, 189 Ill. 2d at 599.

The claimants are, therefore, entitled to all litigation expenses incurred throughout this action, including in this appeal.