2024 IL App (1st) 231466-U

SIXTH DIVISION
August 16, 2024

No. 1-23-1466

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| JUSTIN JANDA and PAUL BOLLINGER, | ) ) | On Petition for Direct Administrative Review of an Order of the Illinois Labor Relations Board, Local Panel |
| Petitioners, | ) ) ) | |
| v. | ) ) | |
| | ) | |
| ILLINOIS LABOR RELATIONS BOARD, COUNTY OF COOK, and SHERIFF OF COOK COUNTY, | ) ) ) | Charge No. L-CA-21-033 |
| Respondents. | ) | |

JUSTICE TAILOR delivered the judgment of the court.
Presiding Justice Oden Johnson and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Illinois Public Labor Relations Act does not permit the imposition of monetary damages to compensate individuals for nonpecuniary harm such as emotional distress. Therefore, we affirm the decision of the Illinois Labor Relations Board.

¶ 2                                    I. BACKGROUND

¶ 3    In 2020, Justin Janda and Paul Bollinger were working as correctional officers with the Cook County Sheriff's Office (Sheriff's office). Bollinger and Janda had worked as correctional officers since September 2011 and November 2014, respectively. They were both assigned to work in Division 11, one of several inmate facilities at the Cook County Jail that houses both maximum and medium security inmates. As correctional officers, Janda and Bollinger were responsible for

the supervision, security, and safety of inmates of Cook County jails, and they were expected to follow Sheriff's office policies, practices and procedures.

¶ 4      On December 25 and 26, 2020, when Janda and Bollinger worked their usual 3 pm to 11 pm shift in Division 11, they were informed that "cross watching" would be required because of staffing shortages due in part to COVID-19 related call offs. Cross watching is a practice where one correctional officer simultaneously supervises two housing units from the control center of one of the units. In 2010, the Cook County Department of Corrections (CCDOC) entered into an Agreed Order to settle federal litigation initiated by the United States Department of Justice (DOJ) that addressed the constitutionality of inmate conditions at the jail. As one of the conditions of the Agreed Order, the CCDOC agreed to "maintain a practice that does not allow for scheduled, planned, or expected cross-watching" in maximum security units, and "work to eliminate the practice [of cross-watching]" altogether throughout the facility. On June 26, 2018, the court terminated the Agreed Order but the CCDOC continued to comply with its terms as best practices. However, cross watching was still conducted at certain times throughout the jail even though it was considered an "unpopular practice" among correctional officers.

¶ 5      In his time as a correctional officer, Bollinger had never been required to cross watch. When he heard that officers would be required to cross watch on Christmas Day, December 25, 2020, he spoke out against the practice, arguing that it was "against the safety and security of the lives of the detainees and the officers in the building." Although he had not been ordered to cross watch himself, Bollinger encouraged other correctional officers to refuse their cross-watching orders.

¶ 6      In Janda's time as a correctional officer, he had never been required to cross watch either. When he was assigned to cross watch two living units on December 26, 2020, he refused to do so,

2

and spoke out against the practice. He said that it was unsafe to cross watch, and that he believed that the practice violated the terms of his Collective Bargaining Agreement as well as DOJ policy. Lieutenant Robert Lucas told him, "they'll come for your job. This isn't something *** you should fight." Salomon Martinez, superintendent of Division 11, arrived and said to him, "It was nice working with you… look for trouble and check your email." He added, "you'll never work in this building again."

¶ 7     Later that day, Martinez filed a complaint register against Janda and Bollinger with the Office of Professional Review (OPR), for refusing to take an assignment and/or for encouraging others not to take their assignments. Michael Miller, the Executive Director of Operations for the CCDOC at the time, decided to transfer Janda and Bollinger out of Division 11 pending the OPR investigation under Article U and Section 14.4(b) of the Collective Bargaining Agreement between the Sheriff's Office and the Teamsters Union, which permits an employer to "reassign any employee while investigation of possible wrongful behavior is completed." Miller said he transferred Janda and Bollinger for the welfare of the staff on duty and the inmates. He explained that any time an officer refuses to perform their duties, they put the welfare of other staff members in jeopardy. Janda was transferred to Division 9 and Janda was transferred to Division 10, both of which are maximum security divisions.

¶ 8     On December 29, 2020, Bollinger and Janda each filed an OPR complaint against Cook County and the Sheriff's office. They alleged that cross-watching is an unsafe practice and that the Sheriff's office retaliated against them by transferring them out of Division 11 after they protested unsafe working conditions. On February 16, 2021, Bollinger and Janda filed a charge with the Illinois Labor Relations Board's (ILRB) Local Panel, alleging that the Sheriff's office violated Sections 10(a)(1) and (2) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/10(a)(1),

(2) (West 2020)), when it "interfered with concerted action for mutual aid or protection such as voicing safety concerns." While the OPR investigation was pending, Janda and Bollinger continued to work in their assigned divisions. They both eventually resigned their employment with the Sheriff's office, Bollinger on August 3, 2021, and Janda on December 28, 2021.

¶ 9    A hearing before the ILRB was held on June 6, 7, 28 and 29, 2022. Janda, Bollinger, Martinez, Miller, Lucas, and Peter Kramer, Special Counsel and Representative for the Sheriff's office, testified.

¶ 10    During his testimony, Janda described Division 9 as a "dungeon" and said that he experienced migraines due to the "the poor ventilation, the stress, the lighting, [and] the noise" there. He said that the inmates there are the "worse (sic) of the worst," and that working in Division 9 was "dreadful" and "not safe" because it was staffed by "nothing but rookies." He testified that his decision to resign from the Sheriff's office was entirely due to the "retaliation and harassment" he experienced from the Sheriff's office after he spoke out against cross watching.

¶ 11    Bollinger said that his transfer to Division 10 affected his mental health and ultimately contributed to his decision to resign from the Sheriff's office on August 3, 2021. He said he felt "dejected, hopeless, [and] miserable" after he was transferred to Division 10, because he was given "the worst assignments" and was treated differently than everybody else because of the pending investigation against him. He said that his anxiety was getting rather severe, and that he was suffering from panic attacks after the transfer, yet admitted that he never sought any mental health treatment.

¶ 12    On January 4, 2023, the administrative law judge (ALJ) issued her Recommended Decision and Order (RDO). In it, the ALJ found that Janda and Bollinger engaged in protected concerted activities when they protested cross watching on December 26, 2020. She found that the Sheriff's

office violated section 10(a)(1) of the Act when it filed a complaint register against Janda and Bollinger and transferred them to maximum security divisions. The ALJ also found that the Sheriff's office violated Section 10(a)(1) of the Act when its agents made threats in response to Janda and Bollinger's protests against cross watching at the jail. The ALJ noted that "Lucas told Bollinger that the administration would 'come for his job' and that he should have filed a grievance instead," and that Martinez informed Janda that he should "look for trouble" and told him he would "never work in [Division 11] again." The ALJ concluded that such threats of termination and permanent removal from Division 11 would cause a reasonable employee to refrain from engaging in protected, concerted activity in the future. However, the ALJ did not find that initiating the OPR investigation and transferring Janda and Bollinger to maximum security divisions imposed intolerable working conditions sufficient to find that the Sheriff's office constructively discharged Janda and Bollinger.

¶ 13    As a remedy for the violations, the ALJ ordered the Sheriff's office to cease and desist from interfering with, restraining or coercing their employees in the exercise of the rights guaranteed them under the Act; to withdraw the complaint registers filed against Janda and Bollinger; to dismiss or administratively close the OPR investigations of Janda and Bollinger based on their cross-watching protests; to expunge all record of such complaint registers and OPR investigations from Janda and Bollinger's employment records; and to post a notice in conspicuous places around the jail, notifying employees of its decision.

¶ 14    Janda and Bollinger did not take issue with the ALJ's denial of their constructive discharge claim, and instead, challenged only the remedies provided by the ALJ's RDO. They argued before the ILRB's Local Panel that the ALJ erred by failing to award consequential damages or make-whole relief based on the "severe emotional distress" they experienced as a result of the violations

the ALJ determined the Sheriff's office committed. They claimed that in *Thryv. Inc., and the International Brotherhood of Electrical Workers, Local 1269*, 372 NLRB No. 22 (Dec. 13, 2022), the National Labor Relations Board (NLRB) expanded the available remedies under the National Labor Relations Act (NLRA) to include consequential damages as part of a make-whole remedy, and argued that the ILRB should do the same.

¶ 15    After reviewing the record, the ILRB's Local Panel issued its decision on July 14, 2023. It accepted the ALJ's findings and recommendations, adopted the ALJ's RDO as its own, and rejected Janda and Bollinger's argument that the NLRB's decision in *Thryv* supported their position, calling it "meritless." The ILRB stated, the "NLRB's decision in *Thryv* does not purport to change the law on make-whole relief" or "require consequential damages and/or damages for emotional distress." It noted that "the NLRB in *Thryv* did not use the term 'consequential damages' when describing its holding" and "expressly declined to extend its make-whole remedy to include compensation for nonpecuniary harms such as emotional distress." It concluded that awarding damages for emotional distress was more akin to awarding punitive damages, and that there was "nothing in the Act that allows for the award of punitive damages." It also found that the "imposition of consequential damages could potentially be barred by the Local Governmental and Governmental Employees Tort Immunity Act (the Tort Immunity Act), 745 ILCS 10/1-101 et seq., if the damages were deemed punitive or exemplary, as opposed to merely compensatory."

¶ 16    Janda and Bollinger timely appealed the Board's final administrative decision to this court.

¶ 17                                II. ANALYSIS

¶ 18    We have jurisdiction over this direct administrative review action under section 11(e) of the Act, 5 ILCS 315/11(e) (West 2022), section 3-113 of the Administrative Review Law, 735 ILCS 5/3-113 (West 2022), and Illinois Supreme Court Rule 335. Ill. S. Ct. R. 335 (West 2022).

¶ 19     Janda and Bollinger raise a single issue on appeal. They argue that the ILRB "committed clear error when it failed to award monetary damages, or other make whole relief, *** as a result of the [Sheriff's office's] violation of Section 10(a)(1) of the Act" for the emotional distress they suffered.

¶ 20     This case presents a question of law, so we review it *de novo. City of Belvidere v. Illinois State Labor Relations Board,* 181 Ill. 2d 191, 205 (1998) (stating that an administrative agency's findings on a question of law are reviewed on a *de novo* basis).

¶ 21     Section 11(c) of the Act addresses remedies for unfair labor practices. It states that "if *** the Board is of the opinion that any person named in the charge has engaged in or is engaging in an unfair labor practice *** then it shall issue and cause to be served upon the person an order requiring him to cease and desist from the unfair labor practice, and to take such affirmative action, including reinstatement of public employees with or without back pay, as will effectuate the policies of this Act." 5 ILCS 315/11(c) (West 2022).

¶ 22     Janda and Bollinger point to the "take such affirmative action" language of section 11(c) and argue that in cases like this, where there is no back pay award, plaintiffs "should be entitled to a fuller panoply of damages." They contend that in *Thryv*, the NLRB "ruled for the first time that consequential damages are available under the National Labor Relations Act ('NLRA') as part of the 'make-whole' remedies that the Board is empowered to award." They point to the following language in *Thryv*—"we find it necessary to ensure that affected employees are made fully whole for the costs they incur as a result of the respondent's unlawful actions" and "to best effectuate the purposes of the Act, our make whole remedy shall expressly order respondents to compensate affected employees for all direct or foreseeable pecuniary harms that these employees suffer as a

7

result of the respondent's unfair labor practice"—to argue that the make-whole remedies should have been extended to include monetary compensation for their emotional distress here.

¶ 23    However, the NLRB's discussion of remedies in *Thryv* upon which Janda and Bollinger rely was recently vacated by the Fifth Circuit Court of Appeals in *Thryv, Inc. v. National Labor Relations Board,* 102 F.4th 727 (5th Cir. 2024). The Fifth Circuit expressly vacated the section of the NLRB's order discussing its "make-whole" remedy and referred to the NLRB's order—that the employer make the workers whole for all losses incurred as a direct or foreseeable result of the layoffs—as a "a novel, consequential-damages-like labor law remedy" that would require the employer to "take draconian steps to remedy the alleged violations." *Id*. at 733, 737.

¶ 24    Even if the NLRB's *Thryv* decision was still good law, it did not require the award of damages for emotional distress in unfair labor practice cases, and instead, expressly "decline[d] to extend make-whole relief to nonpecuniary harms" such as compensation for "pain and suffering" or "emotional distress." *Thryv. Inc., and the International Brotherhood of Electrical Workers, Local 1269*, 372 NLRB No. 22, n. 13 (Dec. 13, 2022). Janda and Bollinger provide no other support for their contention that they should be compensated for the emotional harm they suffered as a result of the Sheriff's office's actions.

¶ 25    While the language of the Act expressly references reinstatement and back pay, monetary damages for emotional harm are never mentioned. In *Laura Foster and Chicago Transit Authority,* 31 PERI ¶ 40 (ILRB Gen. Counsel 2012), an employee alleged that her employer violated the Act when it retaliated against her by suspending her. As a make-whole remedy, she requested compensation for emotional damages, claiming that "such damages would make her whole, placing her in the position that she would have been in prior to [her employer's] wrongful conduct." The Board declined to award her such relief, reasoning that "the legislature did not grant

the Board the broad authority which the [employee] envisions." It noted that while the term "make-whole remedy" included reinstatement and back pay, nothing in the Act "authorize[d] the payment of damages for emotional injury or pain and suffering." It concluded that "[a] make-whole remedy does *not* mean that a charging party can obtain such damages [for emotional injury or pain and suffering] from the Board." (Emphasis in original.)

¶ 26　　The traditional remedy in discrimination and retaliation cases is a "make-whole" order, which may include reinstatement and the award of backpay plus interest. See *William McIntyre and City of Chicago (Department of Sewers),* 13 PERI ¶ 3009, n.12 (ILRB 1997). A survey of cases tends to confirm that "make-whole" damages under the Act are confined to pecuniary damages that are readily quantifiable. See, *e.g., Nortech Waste and Operating Engineers Local Union No. 3 of the International Union of Operating Engineers, AFL-CIO*, 336 NLRB 554, n. 2 (2001) (ordering that an employee be made whole for any medical expenses she incurred as a result her reassignment, reasoning that "[u]nlike nonspecific damages such as pain and suffering," the medical expenses sought to be reimbursed were "not speculative" and instead, were "specific and easily ascertained"); *Policemen's Benevolent Labor Committee and City of Sparta*, 30 PERI ¶ 231 (ILRB Gen. Counsel 2013) (ordering the City to reimburse employees for the increase in health care costs they incurred when the City changed the health insurance to one with higher co-payments because the payments were easy to quantify and directly attributable to the unfair labor practice); *Rockford Education Association, IEA-NEA and Rockford School District No. 205*, 21 PERI ¶ 179 (Sept. 27, 2005) (ordering public school teachers to be reimbursed for the costs they incurred in implementing a pilot program that the school district required of them).

¶ 27　　Nothing in the plain language of the Act permits individuals to recover payment for emotional distress and Janda and Bollinger point to no authority that would lead us to conclude

otherwise. Therefore, we find that the ILRB properly denied compensation to Janda and Bollinger for any alleged emotional distress.

¶ 28                    III. CONCLUSION

¶ 29    For the foregoing reasons, the judgment of the Board is affirmed.

¶ 30    Affirmed.