2026 IL App (1st) 250548-U

No. 1-25-0548

First Division
March 31, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| SHIRLEY WADE-NELSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 24 L 50628 |
| ILLINOIS DEPARTMENT OF | ) | |
| EMPLOYMENT SECURITY, DIRECTOR | ) | |
| OF THE ILLINOIS DEPARTMENT OF | ) | |
| EMPLOYMENT SECURITY, BOARD OF | ) | |
| REVIEW, and VILLAGE OF EVERGREEN | ) | Honorable |
| PARK, | ) | Daniel P. Duffy |
| | ) | Judge, presiding. |
| Defendants-Appellees. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Where plaintiff's conduct fell within the definition of misconduct as provided in section 602(A)(5) of the Unemployment Insurance Act, the Board of Review's decision to deny plaintiff's claims for unemployment insurance benefits was not clearly erroneous.

¶ 2 This case comes to us on review of a decision of the Board of Review of the Illinois Department of Employment Security (Board). Plaintiff-appellant Shirley Wade-Nelson, *pro se,* was discharged for alleged insubordination following her refusal to handle cash and perform related administrative tasks while employed as a part-time clerk at the Village of Evergreen Park (Village). Following her discharge, plaintiff applied to the Illinois Department of Employment Security (IDES) for unemployment insurance benefits. The Village filed a protest alleging that plaintiff's discharge was based upon her misconduct. Following a review by an IDES claims adjudicator and a subsequent hearing on the merits before an IDES referee, plaintiff's application for benefits was denied. Plaintiff appealed the referee's decision to the Board. The Board upheld the referee's decision and determined that plaintiff was ineligible to receive benefits because she had been discharged for misconduct under sections 602(A)(5) and 602(A) of the Unemployment Insurance Act (Act) (820 ILCS 405/602(A)(5), 602(A) (West 2024)). Plaintiff then filed a complaint for administrative review in the circuit court of Cook County. The circuit court affirmed the Board's decision and plaintiff now appeals.

¶ 3 For the reasons that follow, we affirm the decision of the Board.

¶ 4                                    I. BACKGROUND

¶ 5 Plaintiff had been employed by the Village in the administration department from April 27, 2018, until her discharge on June 16, 2023. In a letter dated March 14, 2023, addressed to plaintiff from the Village human resources director, Heather Kokodynsky, plaintiff was advised that there were no new projects for her to work on in the Village administration department and that she would continue to be assigned work as a part-time clerk at the Village's Office of Citizen Services (OCS). According to the letter, plaintiff's duties in the reassigned position included continuing to "greet walk-up customers, answer phone calls, respond to inquiries regarding Village

services, and complete assigned projects." The letter also included a response to plaintiff's apparent inquiry regarding the manner in which to file a complaint for workplace harassment.

¶ 6    A disciplinary action notice included in the record reflects that plaintiff was suspended for tardiness on May 19, 2023. Attached to the notice was a summary of a meeting with plaintiff, Kokodynsky, Beth Novotney, OCS Director, and Kim Cericola, Deputy Village Clerk, which occurred May 18, 2023, the day prior to the suspension. Relevant here, plaintiff stated that she did not want to take funds from residents until the harassment matter was resolved. Cericola advised plaintiff that taking in money was an essential part of her job and that she had performed this task in the past. In response to plaintiff's inquiry as to what would happen if she refused, she was advised that she would be terminated. Plaintiff further stated that she did not want to be accused of stealing and wanted to wait until the complaint was resolved. When asked if she had ever been accused of stealing, plaintiff responded "no and that she would rather not do it [take money] until the harassment [was] resolved."

¶ 7    Another disciplinary action notice included in the record, dated June 6, 2023, indicates that plaintiff was suspended for failure to perform job duties on June 2, 2023. The suspension was from work, without pay, for three days, beginning Thursday, June 8, 2023, and ending on Monday, June 12, 2023. The notice additionally indicated that plaintiff's "failure to satisfactorily perform the duties of the position [would] result in termination." Attached to the notice is a copy of an incident report dated June 2, 2023, addressed to Kokodynsky from Novotney. The report details that on that date, plaintiff came into Novotney's office and stated that a gentleman was at the office to purchase a ticket for a luncheon. When Novotney asked plaintiff if she would assist the gentleman, plaintiff left Novotney's office and sat down at her (plaintiff's) desk. Novotney then proceeded to take the gentleman's ticket purchase money. Later, plaintiff stated to Novotney that she was

willing to work on other projects that do not deal with money, but that she was not comfortable handling money "until this situation is over."

¶ 8    Also attached to the June 6, 2023, disciplinary action notice is a copy of a meeting report attended by plaintiff, the Village mayor, and Kokodynsky. The report essentially recounted the June 2 incident involving plaintiff's refusal to manage the ticket purchase, explained that continued refusals would result in termination, and announced the three-day suspension. When asked by the mayor if she would be handling cash upon her return to work following the suspension, plaintiff replied, "I don't know." The mayor advised plaintiff that this was a final warning and concluded that "[f]ailure to do your job will result in termination of employment."

¶ 9    Included in the record is a letter dated June 13, 2023, from plaintiff, addressed to the Village mayor and copied to Kokodynsky. Plaintiff writes that the letter is in response to a June 6, 2023, meeting with her, the mayor, and Kokodynsky, concerning the "Office of Citizen Services (Handling Cash)." In the letter, plaintiff states that she is "not confident this will work out with handling money, due to all the harassment and deception at work, I do not feel comfortable collecting cash that is being received for different events until this matter is resolved with the Illinois Department of Human Rights." In the following paragraph, plaintiff notes that "the money collected in the [office] is not secure and should be under lock and key because all staff members, volunteers, and anyone else have access to a unlock drawer with cash." She then offers suggestions to "keep all staff members and volunteers safe in handling money." The letter concludes with a chronology of events related to her claims of work-place harassment, that includes information on an allergic reaction to dust mites while performing filing duties for the Village and her reassignment from her position as an "Administration Clerk" in the Village's administration office to part-time clerk with the "Village Office of Citizen Services Department."

¶ 10 An incident report, dated June 16, 2023, states that upon plaintiff's arrival for work on that date, Novotney had an envelope containing registration materials for the "Memories-to-Go" program. She asked plaintiff to place the registration information on a spreadsheet by the end of the day. Plaintiff refused and stated that she would not do so "until this thing [was] completed." Plaintiff then walked out of Novotney's office.

¶ 11 By letter, on June 16, 2023, the Village advised plaintiff that her employment with the Village was terminated, effective on that same date. In the letter, the Village recounted that on June 6, 2023, plaintiff had been given a final warning that her failure to complete her job duties would result in termination. The letter also stated that on June 16, 2023, plaintiff's supervisor informed the human resources director that plaintiff had refused to enter registration and payment information for the "Memories to Go" program into the database. The letter then "confirmed" plaintiff's dismissal for, *inter alia*, her "failure to complete job responsibilities: specifically, receiving money from customers and data entry of program registration, payments, and receipts." Attached to the letter was an incident report which recounted plaintiff's refusal to input data in the "Memories to Go" spreadsheet on June 16, 2023.

¶ 12 Plaintiff filed an application with IDES seeking unemployment insurance benefits. Subsequent to filing her application, on June 27, 2023, she completed a "Misconduct Questionnaire" as requested by IDES. On the questionnaire, plaintiff indicated that she was discharged because of "failure to complete job responsibilities. Filed a complaint with the Department of Human Right due to Harassment." She stated additionally that "Due to all the harassment, [she] did not feel comfortable handling cash until the situation is resolved with the Department of Human Rights." Also, on the questionnaire, plaintiff acknowledged having received

prior warnings about her conduct. The Village filed a protest to plaintiff's eligibility for benefits, and the matter was then assigned to an IDES adjudicator for review.

¶ 13    The adjudicator determined that plaintiff was ineligible to receive benefits based upon disqualifying misconduct. Plaintiff appealed the adjudicator's decision, and the case was then assigned to an IDES referee, Administrative Law Judge Joseph Perry. In October 2023, an evidentiary hearing was conducted via telephone. The referee affirmed the claims adjudicator's determination and held that plaintiff was not eligible for benefits. Plaintiff then appealed the referee's decision to the Board.

¶ 14    The Board remanded the case for a second hearing as the October 2023 proceeding was not contained in IDES's recording system and no transcript could be prepared for the Board's review. On remand, the assigned referee was instructed by the Board to conduct a new hearing and to issue a decision based on the evidence presented at the hearing on remand, as well as evidence of record from the prior evidentiary hearing.

¶ 15    In April 2024, a second evidentiary hearing was held pursuant to the Board's remand before a different referee, Administrative Law Judge Thomas Plotke. The transcript of the October 2023 hearing, the April 2024 hearing, the parties' exhibits, along with the Board's October 10, 2024, written decision, which is the subject of our review, are included in the record. The following summarizes the testimony adduced at the April 2024 hearing.

¶ 16    Novotney testified that the Village has a written policy that prohibits insubordination, that plaintiff had been warned about the policy, and that plaintiff's June 2, 2023, violation of the policy resulted in a three-day suspension. On June 2, when the Village was selling tickets for a luncheon, plaintiff refused to take a patron's money, and asked Novotney to handle the transaction. In explaining her refusal, plaintiff stated that she "was not comfortable doing that." Novotney then

completed the transaction herself. Afterwards, Novotney discussed the occurrence with plaintiff and advised plaintiff that there would be further action taken for repeated conduct. Novotney also testified that around June 16, there was an incident in which plaintiff was supposed to enter data for "registration for Memories to Go;" she had been sent several e-mails regarding completion of the task; and on the final day of her employment, she stated that she would not perform the task until after her hearing with the Illinois Department of Human Rights. On that same day, plaintiff was discharged for refusing to perform those job duties. Novotney further testified that plaintiff never gave her a doctor's statement indicating that she (plaintiff) could not touch money. Additionally, Novotney testified that plaintiff had been given a copy of her job description at a meeting in May 2023.

¶ 17 On redirect examination by Paula Mack, the Village representative, Novotney testified that when plaintiff was reassigned, she never told her that she was afraid of being robbed. Plaintiff stated only that she would not handle money until the completion of the investigation with the Illinois Department of Human Rights.

¶ 18 Kokodynsky testified that plaintiff's job description stated that plaintiff would have to do data entry of program registrants and also receive "payments and other receipts as well as receive money from customers." Plaintiff had been made aware of her duties on multiple occasions.

¶ 19 At a meeting on June 6, which Kokodynsky also attended, the Village mayor informed plaintiff that her failure to perform her job duties would result in termination. During the meeting, plaintiff, stated that she was not comfortable doing so until the Department of Human Rights complaint was resolved. According to Kokodynsky, the mayor advised plaintiff that this was the second incident for which she was being suspended and that, for this refusal, she was being suspended for three days. When the mayor inquired whether plaintiff would take in money once

she returned from the suspension, plaintiff responded that she was not sure. Kokodynsky further testified that plaintiff did not provide a doctor's note indicating that she could not handle money.

¶ 20    Plaintiff testified as follows. She had received a three-day suspension in June, with which she disagreed. She understood that her refusal to handle cash could result in the loss of her job. However, she was under stress and fearful for her life because there were no safety protocols for handling the cash. The money was visible to the public, people were coming in and out of the office, and she was the first person in contact. She testified that "[e]veryone knew where the money was being kept in a[n] unsecure, unlocked drawer. And the way in today's society you just never know what may happen, who may come in there and rob the place, seeing where the money was being checked." Some of the stress she was experiencing was partly about losing her life. She had recommended suggestions in order to do her job, but the suggestions were ignored.

¶ 21    Plaintiff additionally testified that she had previously worked in the administrative department, in a more secure environment where money was kept in the safe. In July 2022, when she was moved to the Office of Citizen Services, there were no safety protocols. People would come up to the counter and make payments on trips, senior lunches, and things of that nature. People saw where the money was being kept. She had suggested the use of a credit card machine, but the suggestion was not accepted. Later in her testimony, plaintiff stated that she did not want to be "wrongfully blamed for someone else mishandling the cash." Regarding her refusal to perform the data entry function, plaintiff stated that she did not have a problem with data entry. She "had the issue with sitting at [her] desk, the first person in contact, counting cash, having the fear that someone could come in, walk through that door" and demand the money. She testified that she did all of the assignments that involved data entry. When informed by the referee that she had testified contrarily about data entry in the prior hearing, plaintiff stated that she only refused

to handle the money, not perform data entry. Finally, plaintiff testified that she liked where she was working when she was originally hired.

¶ 22    In its decision, the Board stated that it had reviewed the record of the evidence, including the transcript of the hearing, at which both plaintiff and the Village appeared. The Board's findings are summarized as follows. The Village's policy prohibited employees from engaging in insubordination and, on June 6, 2023, warned and suspended plaintiff for three days due to plaintiff's insubordination. On June 16, 2023, plaintiff's supervisor instructed plaintiff to do the data entry of registration and payments for the "Memories to Go" program by the end of the day. Plaintiff responded that she would not perform the tasks as instructed until the situation with the Illinois Department of Human Rights was completed. The Board noted that in October 2022, plaintiff filed a complaint with the Illinois Department of Human Rights due to an allergic reaction to dust mites from her work on certain filing projects.

¶ 23    Further the Board's decision indicated that the evidence presented showed that plaintiff was instructed by the Village to perform certain duties, that the employer's instruction was reasonable and lawful and that plaintiff refused to comply with the instruction. In its decision, the Board recounted plaintiff's testimony to the effect that she refused to comply with the employer's instruction as she was fearful for her life in handling the cash as the employer had no safety protocols. The Board quoted from plaintiff's misconduct questionnaire wherein she stated: "Due to all the harassment, I did not feel comfortable handling cash until the situation is resolved with the Department of Human Rights." The Board then noted in its decision that plaintiff had previously stated to the claims adjudicator that she was asked to handle cash and that she refused because of the cash being in an unsecure area and that she did not want to be responsible for a loss. Additionally, the Board recounted that plaintiff stated to the adjudicator that she had filed a

complaint with the Department of Human Rights and she was not feeling comfortable handling money since she had filed the complaint.

¶ 24    The Board found plaintiff's testimony regarding her reasons for refusing to comply with the Village's instruction not credible as it was "inconsistent" with her statements in the misconduct questionnaire and to the adjudicator. Further the Board determined that plaintiff's refusal "was not due to the lack of ability, skills, or training for [plaintiff] required to obey the instruction or the instruction would result in an unsafe act." The Board held that plaintiff's conduct supported a finding of misconduct pursuant to subsection (A)(5) of Section 602A of the Act.

¶ 25    The Board then proceeded to analyze whether the evidence presented supported a finding of misconduct "also under the general definition of misconduct contained in Section 602(A)" of the Act. In so doing, the Board noted that prior to June 16, 2023, plaintiff had been warned by the Village of possible termination due to her insubordinate behavior and that on June 16, she was insubordinate. Specifically, plaintiff failed to comply with the instruction of the Village's department head supervisor to do the data entry of registration and payment for the Memories to Go program by the end of the day. The Board determined that plaintiff's action on June 16, 2023, constituted a deliberate and willful violation of the Village's policy concerning employee behavior which caused the employer harm. Based on the evidence presented, the Board determined that plaintiff was discharged for misconduct and that she was not eligible for benefits. Thus, the Board affirmed the referee's decision.

¶ 26    On October 31, 2024, plaintiff filed a complaint in the circuit court of Cook County for administrative review. The circuit court affirmed the decision of the Board and this appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    Plaintiff contends that the Village has not shown willful misconduct under section 602(A)(5) of the Act as her refusal to handle cash was "limited, reasonable and in good faith," based on a lack of training and safety concerns. She maintains that the "cash-handling" duties were newly assigned, she had not received any training, and she did not refuse all work. Additionally, she contends, there was no actual or potential harm caused to the Village resulting from her refusal.

¶ 29    Defendants respond that discharge was warranted as plaintiff's refusal to follow her employer's instructions constituted misconduct under both section 602(A)(5) and 602(A) of the Act. Thus, according to defendants, denial of unemployment insurance benefits was statutorily required. We note that the Village did not file a responsive brief in this appeal.

¶ 30    Before proceeding with our analysis, we must address two preliminary matters. The first relates to the substance of plaintiff's brief in this matter. Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) governs the form and content of appellate briefs. The court's rules have the force of law. *Rodriguez v. Sheriff's Merit Commission of Kane County*, 218 Ill. 2d 342, 353 (2006). They are neither suggestions nor are they aspirational and compliance is compulsory. *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8. Further, a party's status as a *pro se* litigant does not relieve him or her of the requisite compliance with the rules of appellate practice. *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78. Thus, although we find it appropriate to acknowledge a party's *pro se* status, we cannot excuse any litigant's noncompliance with the court's rules. *Fryzel v. Miller,* 2014 IL App (1st) 120597, ¶ 26.

¶ 31    Here, in support of each of her three contentions, plaintiff's argument section offers two or three conclusory statements, with citation, generally, to a single case which she perceives supports a particular contention, as well as citation to materials contained in the appendix to her brief. Plaintiff's arguments are, to say the least, seriously underdeveloped. The court's rules,

however, require substantially more. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an appellant set forth an argument section which "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." "Citations to authority that set forth only general propositions of law and do not address the issues presented do not constitute relevant authority for purposes of Rule 341(h)(7)." *Robinson v. Point One Toyota, Evanston*, 2012 IL App (1st) 111889, ¶ 54. In those instances where a party has failed to comply with the court's rules, this court may either strike the brief or dismiss the appeal. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 12. However, we recognize that dismissal is harsh and the preference is always to decide issues on the merits. For those reasons, we elect to proceed with our analysis. See *Fryzel,* 2014 IL App (1st) 120597, ¶ 26 (despite the deficiencies in the appellant's brief, because jurisdiction was proper, the court considered the merits of the appeal for the purpose of settling the issue in dispute). Even so, we admonish plaintiff that the reviewing court is "not a depository in which the appellant may dump the burden of argument and research." *Marriage of Petrik*, 2012 IL App (2nd) 110495, ¶ 38.

¶ 32    The second matter which we must address also relates to plaintiff's brief, but also to contents included in the record. Defendants point out that materials contained in the record, specifically character reference letters and a series of black and white photos submitted to the circuit court, and materials in Appendix B ( "Letter from Beth Novotney") and Appendix E (Employee Handbook Excerpt) of plaintiff's brief, were not submitted during the administrative proceedings and therefore may not be considered by this court. In her reply brief, plaintiff does not argue otherwise. As this court noted in *Persaud v. Illinois Department of Employment Security*, 2019 IL App (1st) 180964, ¶ 27, our review is limited to the record that is properly before us. See *Baker v. Illinois Department of Employment Security*, 2014 IL App (1st) 123669, ¶ 23 (judicial

review of administrative decisions is restricted to the record compiled by the agency, and no new or additional evidence shall be heard by the circuit court). Accordingly, as materials included in the record and in plaintiff's Appendix B and E were not presented during the course of the administrative proceedings, we do not consider them here. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992); see also 735 ILCS 5/3-110 (West 2024) (on administrative review, "[n]o new or additional evidence in support of or in opposition to any *** decision of the administrative agency shall be heard by the court."). That said, we begin our analysis with a discussion of the applicable standards of review of administrative proceedings, which plaintiff asserts here is *de novo*.

¶ 33 In reviewing an appeal from a decision in which unemployment insurance benefits have been denied, we review the decision of the Board, as opposed to the decision of the circuit court. *Petrovic v. Department of Employment Security*, 2016 IL 118562, ¶ 22. A determination of what standard of review applies is dependent on whether the question presented is one of fact, law, or a mixed question of law and fact. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-205 (1998). In reviewing an administrative agency's factual findings, a court will neither reweigh the evidence nor substitute its judgment for that of the agency. *Id.* at 204. The factual findings of an administrative agency are accepted as *prima facie* true and correct, and the reviewing court is left to determine only whether those findings are against the manifest weight of the evidence. *Jackson v. Board of Review of Department of Labor*, 105 Ill. 2d 501, 513 (1985).

¶ 34 With respect to an agency's conclusions of law, we owe considerably less deference. In those instances, our review is *de novo*. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 819 (2009). Thus, an agency's decision on a question of law is not binding on courts of review. *Id.*

¶ 35    Finally, where our review concerns mixed questions of law and fact, we must determine whether the agency's decision was clearly erroneous. *Petrovic*, 2016 IL 118562, ¶ 21. "A mixed question is one in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or whether the rule of law as applied to the established facts is or is not violated." *Moss v. Department of Employment Security*, 357 Ill. App. 3d 980, 984 (2005). Stated more succinctly, a mixed question of law and fact requires a court to determine the legal effect of a given set of facts. *Petrovic*, 2016 IL 118562, ¶ 21. The clearly erroneous standard is less deferential to the agency than the manifest weight of the evidence standard because the agency is deciding the legal application of a factual determination. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security,* 201 Ill. 2d 351, 369 (2002). Under this standard, an agency's decision will be deemed clearly erroneous only if, based upon the entirety of the record, the reviewing court is left with the definite and firm conviction that a mistake has been made. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 36    Here, the Board was required to review the evidence presented, to weigh credibility of the witnesses and to resolve any conflicts in the testimony. The Board was then required to determine whether the evidence before it qualified as misconduct as defined in the Act. Thus, we review the Board's decision in this case for clear error.

¶ 37    We begin our analysis with a review of the Board's factual findings to determine whether they were against the manifest weight of the evidence. In so doing, we are mindful that an agency's findings are against the manifest weight of the evidence only "if the opposite conclusion is clearly evident." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 38    After reviewing the evidence in the record, the Board determined that plaintiff refused to perform duties as assigned. The record reflects that when directed by her supervisor to receive cash payments, plaintiff refused, stating that she was waiting until she received results from an investigation conducted by the Department of Human Rights. She recited that same explanation on the Misconduct Questionnaire. When asked by the mayor if she would receive cash payments once she returned from her three-day suspension, her response was that she was not sure. It was not until the April 2024 hearing before a referee did plaintiff assert, strenuously and consistently, that her refusal to handle cash was based on concerns for her personal safety and the Village's lack of safety protocols. We note additionally the second referee's recollection of plaintiff's seemingly inconsistent statements at the two hearings with respect to her data entry duties. Further, it was Novotney's testimony that on her last day of employment, plaintiff simply refused to perform either the data entry function or receipt of a cash payment from a visiting patron. Kokodynsky testified that on multiple occasions, plaintiff had been given her job description, which included receiving cash payments for programs and data entry. Based upon our review of the evidence, the Board's factual findings do not come even close to being against the manifest weight of the evidence.

¶ 39    The Board determined that plaintiff's refusals qualified as misconduct as that term is defined in sections 602(A)(5) and 602(A) of the Act. We thus consider whether the Board's construction of the term "misconduct" was correct.

¶ 40    Sections 602(A) and 602(A)(5) of the Act, provide in relevant part:

> "For purposes of this subsection, the term '*misconduct*' means the deliberate and willful violation of a reasonable rule or policy of the employing unit, governing the individual's behavior in performance of his work, provided such violation has

harmed the employing unit or other employees or has been repeated by the individual despite a warning or other explicit instruction from the employing unit. The previous definition *notwithstanding*, 'misconduct' shall include any of the following work-related circumstances:

\* \* \*

5. Refusal to obey an employer's reasonable and lawful instruction, unless the refusal is due to the lack of ability, skills, or training for the individual required to obey the instruction or the instruction would result in an unsafe act." (Emphasis added.) 820 ILCS 405/602(A), (A)(5) (West 2024).

¶ 41 Plaintiff argues that section 602(A)(5) defines misconduct as a willful violation of a reasonable rule that harms the employer. Citing the first of the three cases upon which she relies, *Persaud v. Illinois Department of Employee Security*, 2019 IL App (1st) 180964, plaintiff argues that refusing to perform a task due to a lack of training or safety concerns does not qualify as misconduct. Her refusal, she maintains, was based on legitimate safety concerns due to lack of training. Then, citing the second of her three cited cases, *Petrovic v. Department of Employment Security*, 2016 IL 118562, plaintiff argues that misconduct must involve a deliberate and willful violation of a reasonable rule. She asserts that she did not willfully violate any rule because she was not trained to handle cash. Finally, citing the third of the three cases upon which she relies, *Harris v. Illinois Department of Employment Security*, 2018 IL App (1st) 172106, plaintiff argues that misconduct requires actual harm to the employer. She asserts that she did not intend harm to the Village and no harm was caused as a result of her refusals. Thus, she maintains, her refusals did not satisfy the statutory definition of misconduct.

¶ 42    In her attempt to defeat a finding of misconduct, plaintiff denies that she engaged in the conduct proscribed in both sections 602(A) and 602(A)(5). In *Persaud*, 2019 IL App (1st) 180964, ¶ 19, this court had occasion to construe section 602(A) and subsection (A)(5). We held that the Board's interpretation of the word "misconduct" was legally correct, where the Board stated:

> "The new subsection (A)(5) imposes a lower threshold in situations where an employee refuses to follow an employer's reasonable and lawful instruction." There is no requirement that the refusal be willful or deliberate, nor does the law require proof that the employer was harmed or the conduct was repeated, or that the conduct have violated a work-related rule." *Id.* ¶ 20.

We further explained that although the "*general* definition of 'misconduct' requires a deliberate or willful state of mind, repeated conduct, and proof of harm to the employer," the legislature created an exception to the general definition when it enacted subsection (A)(5). (Emphasis in original.) *Id.* ¶ 21.

¶ 43    Thus, in light of our holding in *Persaud,* we find plaintiff's reliance on section 602(A)'s definition of misconduct, which requires conduct to be deliberate and willful and to cause harm to the employer, to be unavailing. That leaves plaintiff's final argument that because there was neither training nor safety measures in place, her refusals were not misconduct under the Act. We perceive this argument to be based on plaintiff's reading of subsection 602(A)(5).

¶ 44    Notably, the concluding sentence in section 602(A) states "[t]he previous definition *notwithstanding*, 'misconduct' shall include" certain work-related circumstances. (Emphasis added.) 820 ILCS 405/602(A) (West 2024). As we set forth earlier, one such work-related circumstance is listed in subsection (A)(5) of the Act and defines misconduct as a "[r]efusal to obey an employer's reasonable and lawful instruction." *Id.* § 602(A)(5). The subsection then

excuses the refusal if it is based on a lack of ability, skills or training, or the instruction would result in an unsafe act. *Id.*

¶ 45    We could perhaps find a scintilla of legitimacy in plaintiff's assertion that safety concerns prompted her refusals had she, in the first instance, expressed those concerns as the basis of her refusals. But she did not. During the evidentiary hearings, Novotney and Kokodynsky both testified that the only reason plaintiff ever gave to them for her refusals to handle the cash was related to the Department of Human Rights investigation. Apparently, the Board believed their testimony over that of plaintiff's. See *Pesoli v. Department of Employment Security*, 2012 IL App (1st) 111835, ¶ 26 ("It is the Board's responsibility to weigh the evidence, evaluate the credibility of the witnesses and resolve conflicts in testimony."); see also *Hurst v. Department of Employment Security*, 393 Ill. App 3d 323, 329 (2009). Further, there is no suggestion that the amount of cash to be handled was enormous, or that strict accounting principles applied. Thus, we find plaintiff's assertion of a lack of training as a shield to finding misconduct to be wholly without merit. In any case, based on our review, it appears that the Board correctly interpreted sections 602(A) and (A)(5) of the Act.

¶ 46    Further, on more than one occasion, plaintiff refused the Village's directive to receive cash from patrons for certain Village-sponsored programs and to perform data entry. Also, and on more than one occasion, plaintiff refused, offering as her reason, that she was awaiting the outcome of an investigation by the Department of Human Rights. Additionally, plaintiff had been provided a job description, and the functions of her position had been explained by the Village mayor as well as by her supervisor. Finally, although not raised by plaintiff, the Village's instructions were reasonable and lawful. See *Sudzus,* 393 Ill. App. 3d at 826 (an instruction is "reasonable" if it

"appropriately relate[s] to the workplace" and concerns standards of behavior than an employer has a right to expect from an employee.).

¶ 47    The Board found plaintiff's conduct qualified as misconduct as defined under the Act. We find no error in the Board's interpretation of either 602(A) or 602(A)(5) of the Act.

¶ 48                                  III. CONCLUSION

¶ 49    Section 602(A) of the Act provides that "[a]n individual shall be ineligible for benefits for the week in which he has been discharged for misconduct connected with his work." 820 ILCS 405/602(A) (West 2024). Based on our review of the record before us, we are persuaded that the Board's decision was correct. As we find no clear error in the Board's decision, we affirm.

¶ 50    Affirmed.